### IN THE UNITED STATES COURT OF FEDERAL CLAIMS
**Bid Protest**

| | |
|---|---|
| WORKHORSE GROUP INC., ) | |
| ) | |
| Plaintiff, ) | Case No. ___1:21-cv-01484-ZNS___ |
| ) | |
| v. ) | Judge ___Zachary N. Somers___ |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| Defendant. ) | ███████████████ |

## **COMPLAINT**

Plaintiff Workhorse Group Inc. ("Workhorse"), by counsel, files this Complaint against Defendant, the United States of America, and states as follows:

### **Nature of the Action**

1.      This is a post-award bid protest challenging the award of an Indefinite Delivery, Indefinite Quantity ("IDIQ") contract by the United States Postal Service ("USPS" or the "Agency") under Solicitation No. 3D-20-A-0031 (the "Solicitation") for Next Generation Delivery Vehicles ("NGDV") to Oshkosh Defense, LLC ("Oshkosh").

2.      The USPS's actions with respect to this procurement were arbitrary, capricious, and without rational basis.

3.      The USPS's unreasonable actions directly harm Plaintiff, an offeror that submitted a proposal for the NGDV production contract in response to the Solicitation.  Had the USPS conducted the procurement in accordance with applicable law, the Solicitation requirements, and fundamental fairness, Workhorse would have been awarded the contract.

4.      At the invitation of the USPS, Workhorse, together with its former partner in the NGDV program, ███████████████████████, spent six years and over $6 million designing, prototyping and refining a proposed NGDV to meet the USPS's needs for a replacement for its aging and antiquated fleet of Grumman Long Life Vehicles ("LLV").  It is now clear, however, that the USPS never had any intention of fairly considering Workhorse for the award of the NGDV production contract.

5.      The USPS evidently decided early in the NGDV Program that Workhorse would not be the awardee, but it chose not to inform Workhorse of this fact, instead allowing and even encouraging Workhorse to continue to pursue the contract.  In the meantime, the USPS put its thumb on the scale against Workhorse.  It falsely blamed Workhorse's prototype vehicle for a "safety incident" that was clearly the result of the USPS driver's error.  It engaged in discussions with Workhorse that improperly failed to meaningfully notify Workhorse of perceived deficiencies in its proposal and that misled Workhorse as to the areas Workhorse needed to address in its updated proposal.  And it unfairly evaluated the merits of Workhorse's proposal, treating Workhorse far more harshly and holding it to far stricter standards, than it did the other offerors.  As was the USPS's design all along, these improper actions left Workhorse with a technical score that ensured it had no fair chance of a contract award.

6.      None of this was known to Workhorse.  Complying with the letter and spirit of the NGDV program, and drawing on its experience successfully designing and building last-mile delivery vehicles for such companies as United Parcel Service, Workhorse designed an innovative all-electric vehicle from the ground up to meet the USPS's specific requirements.

7.      As required by the USPS, Workhorse designed its vehicle in a highly compressed timeframe, completing the initial design in only one year and building six prototypes in a mere

2

eighteen weeks.  The USPS subjected Workhorse's prototypes to rigorous testing designed to identify flaws and weaknesses that could be addressed in anticipation of proposals for a contract for final development and large-scale production.  Workhorse and its well-established engineering and manufacturing partners refined the Workhorse vehicle design to address every issue identified through prototype testing and otherwise improve the vehicle to meet or exceed the USPS's requirements.  Along with two other competitors, Workhorse submitted a proposal for the USPS production contract, relying on the USPS to evaluate the proposals as set forth in the USPS's contract Solicitation.

8.      On February 23, 2021, the USPS announced that it had selected Oshkosh for the $3.1 billion contract to produce up to 165,000 NGDVs.  Several aspects of the announcement were surprising, not just to Workhorse but to members of Congress, the media and other observers who had closely followed the USPS's NGDV program.  First, the selected Oskosh vehicle uses an internal combustion engine (with 10 percent of the production vehicles potentially being electric), in stark contrast to the entire last-mile delivery industry (*e.g.*, UPS, FedEx, Amazon, DHL), which is aggressively moving toward all-electric, zero emissions fleets. The USPS's attempts to defend this decision on cost grounds was startling, as the reason the industry is adopting electric fleets as quickly as possible is precisely because it is now well-established that electric vehicles have a significantly *lower* total cost of ownership than gas-burning vehicles.  As the USPS's for-profit competitors recognize, the vast savings on fuel and maintenance dramatically outweigh the additional costs of charging infrastructure.

9.      Second, it quickly became apparent that the Oshkosh vehicle the USPS had selected for production was entirely different than the vehicle Oshkosh had put forward in the prototype phase.  The artist's renderings of the selected vehicle that were released to the media

showed a vehicle completely unlike the Ford Transit-based prototypes that were put through the USPS's testing. Even though "prototype performance" was specifically identified as an evaluation subfactor, the USPS had selected a vehicle from Oshkosh that skipped the prototype phase altogether. This was especially puzzling given that Oshkosh has never previously produced a last-mile delivery vehicle, much less an electric one.

10.     Third, the USPS's contract award announcement stunningly revealed that the USPS would pay Oshkosh $482 million simply to finish the development of its concept, before a single truck is delivered. By contrast, Workhorse's vehicle needs only approximately ███ ████ to incorporate the proposed improvements to its prototype, out of a total of ██████ for design, testing and assembly. The USPS inexplicably opted to pay Oshkosh ███████ that amount to accomplish the same thing.

11.     Emblematic of the USPS's unfair treatment of Workhorse is its repeated citation of an alleged "roll-away incident" among the top reasons that it "would never have selected [Workhorse's NGDV] for its flagship vehicle." The USPS misleadingly claims that a flaw in Workhorse's parking brake system caused Workhorse's prototype vehicle to roll down an incline and into a ditch, injuring a test track driver. This account is demonstrably false. In reality, the USPS test track driver, presumably intending to stop the vehicle, incorrectly left it in "Drive" rather than "Park." The driver then left the driver's seat and walked to the cargo area. Unsurprisingly, as the vehicle was in "Drive," the vehicle began rolling. Instead of properly applying the brake or placing the vehicle in "Park" the driver jumped out of the vehicle and it rolled down a slope and into a ditch. Rather than acknowledge the clear driver errors, the USPS not only disingenuously directed the blame at Workhorse but has seized upon this incident as its "posterchild" reason it could not have awarded the contract to Workhorse.

4

12.     Workhorse respectfully seeks an order from this Court invalidating the Agency's award to Oshkosh and instructing the USPS to award the NGDV contract to Workhorse as the offeror whose proposal provided the best value or, in the alternative, instructing the USPS to make a new award decision based on a rational best value analysis in accordance with the terms of the Solicitation.

### Jurisdiction

13.     This is a bid protest by an interested party "objecting to  . . . the award of a contract . . . in connection with a procurement."  28 U.S.C. § 1491(b)(l).  Additionally, this Court has jurisdiction to consider this action because it is "a claim that the Government breached an implied-in-fact contract to fairly and honestly consider an offeror's proposal in the procurement context" under Section 1491(b)(l).  *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1332 (Fed. Cir. 2021).  *See also Emery Worldwide Airlines, Inc. v. United States*, 49 Fed. Cl. 211, 220 (2001) (finding the USPS a "federal agency" under the Administrative Disputes Resolution Act, and, consequently, jurisdiction exists under the Tucker Act), *aff'd*, 264 F.3d 1071, 1080 (Fed. Cir. 2001).

14.     The Plaintiff, Workhorse, is a corporation that is incorporated in Nevada with its principal place of business in Ohio.  Workhorse is a technology company focused on providing sustainable and cost-effective solutions to the transportation sector.  As an American manufacturer, it creates all-electric delivery trucks and drone systems, including the technology that optimizes the way these mechanisms operate.  In fact, Workhorse is the only company with a fully electric last-mile delivery truck on the road in the United States and is the only company in the world that has an electric delivery truck with an integrated aerial drone delivery system.  Workhorse's delivery trucks are used on daily routes across the United States, with customers

such as . At present, it also has approximately ███████ in purchase orders for such vehicles from ██████████ ████████████████. In addition to improved fuel economy, its all-electric vehicles are anticipated to reduce long-term vehicle maintenance expenses by approximately 60 percent as compared to fossil-fueled trucks.

15.     The Defendant is the United States of America, acting by and through the USPS.

## Standing

16.     Workhorse is an actual offeror for the NGDV contract under Solicitation No. 3D-20-A-0031, and submitted a compliant proposal in response thereto.  But for the Agency's marked deviation from the terms of its Solicitation and applicable laws and regulations, Workhorse would have been evaluated as one of the most advantageous offerors and awarded the NGDV contract.  Accordingly, Workhorse is an interested party with standing to challenge the USPS's award to Oshkosh.

## Background

### *The NGDV Program*

17.     The USPS operates a fleet of over 200,000 vehicles in the United States and its territories.  Approximately 163,000 of those vehicles are approaching the end of their life cycle and require costly modifications and maintenance to extend their use.  In preparation for their retirement, the USPS developed the Next Generation Delivery Vehicle Program (the "NGDV Program") to "design a vehicle that places the operator's interactions with the vehicle at the forefront of the design[,]" minimizing drivers' time and effort, and safely, and effectively, storing postal cargo.  Solicitation, Attachment 1, Amend. 1 (Mar. 17, 2020) [hereinafter "SOW"] at 7. [1]

---

[1] Pin citations reflect PDF page numbers.

The NGDV Program was purportedly forward-thinking, seeking a "modern fleet" and, accordingly, encouraging offerors to adopt innovative and sustainable technologies such as alternative fuel systems and autonomous capabilities.  Solicitation at 15.

18.     The NGDV Program proceeded in phases, including the Prototype Phase and the Production Phase.

19.     The Prototype Phase commenced on October 20, 2015, when the USPS issued a solicitation "for the design, development, manufacture, delivery, and program management of . . . prototype vehicles."  Solicitation No. 3D-16-A-0007, Section A at 4.  On September 16, 2016, VT Hackney, with Workhorse as subcontractor, was selected as one of six manufacturers for award of a prototype contract (the "Suppliers").[2]  Contract No. 3DVPRT-16-B-0060 at 1.

20.     In this Prototype Phase, Suppliers were contracted to design and manufacture six fully functioning NGDVs in accordance with the USPS's stated objectives and milestones (the "Prototype Vehicles").  Solicitation No. 3D-16-A-0007, Section A at 4.  Such milestones included opportunities for the USPS to review Suppliers' preliminary and revised designs as well as construction and testing.  Upon delivery of the Prototype Vehicles to the USPS, the Agency

---

[2] ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████████

would test them extensively over a period of twenty-six weeks for, *inter alia*, emissions and fuel economy, ergonomics, aesthetics, handling, and durability.  *Id.* at 7, 13–14.

21.     Workhorse submitted a fully electric delivery vehicle at the Prototype Phase, which it designed and constructed entirely from scratch specifically to meet or exceed the USPS's requirements and purposes.  In stark contrast, Oshkosh submitted a Ford Transit-based vehicle, *i.e.*, an already existing commercial vehicle with a Ford Transit chassis and customized body.

22.     During the Prototype Phase, the USPS conducted a series of tests on the Prototype Vehicles, which revealed certain safety, ergonomic, and other flaws in all of the offerors' Prototype Vehicles.  Consistent with the purpose of the Prototype Phase, Workhorse studied the testing results and revised its design accordingly to resolve any shortcomings the USPS identified.  Of its own volition, Workhorse also identified additional opportunities to improve its Prototype Vehicle.

23.     The USPS then commenced the Production Phase.

### The Solicitation: Issuance and Overview of NGDV Production Phase

24.     The USPS issued the Solicitation on December 27, 2019.

25.     The Agency sought proposals for award of an IDIQ Fixed Price with Economic Price Adjustment contract for a minimum of 50,000 and maximum of 165,000 NGDVs. Solicitation at 1, 8.  The USPS reserved the right to make multiple awards, and to negotiate the minimum quantity based on offerors' proposed pricing.  Solicitation at 1–2.

26.     Proposals were due on July 14, 2020.  Solicitation, Amend. No. 0005 at 1.

27.     The Solicitation stated that the USPS would award the contract "to the offeror whose offer conforming to the [S]olicitation is deemed to offer the Postal Service the best value,

price and other factors, as specified" in the Solicitation.  Solicitation at 9.  Specifically, the USPS

committed to make awards to the "offeror(s) whose proposal offers the best value to the Postal

Service.  Best value offer(s) will be determined after the completion of the evaluation phase by

weighing total cost of ownership, technical evaluation results, and risk."  Solicitation,

Attachment 7 at 1.

### *The Solicitation: Requirements*

28.     The Statement of Work, attached to the Solicitation, identified the USPS's

specific requirements for the NGDVs, comprising preliminary requirements used in the

Prototype Phase and additional requirements developed through evaluation and testing of the

Prototype Vehicles.  SOW at 7.

29.     Technical requirements for the NGDVs included, *inter alia*, specified cargo

capacity, safety measures, physical dimensions, components and accessories, ability to perform

under a range of conditions and speeds, use of certain materials, and an effective minimum

service life of 20 years.  *See id*. at 56–87; 92–110.

30.     Additionally, the Solicitation required the USPS to comply with the National

Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, which "ensure[s] that the federal

government gives proper consideration to the environment prior to undertaking any major federal

action that could significantly impact the environment."  Solicitation at 15.  To comply with

NEPA, the USPS intended to prepare an Environmental Impact Statement ("EIS") to assess the

environmental impact of any award made pursuant to the Solicitation and, while the NEPA

review would remain independent of the evaluation and contract award, any such award would

"be contingent on the Postal Service's satisfactory completion of the NEPA EIS process."  *Id*.  If,

upon completion, the USPS concludes it must alter any NGDV requirements, it may need to

modify the quantity, type, or delivery timeline of the NGDVs, or terminate the award(s) entirely. Accordingly, any contracts awarded pursuant to the Solicitation are strictly contingent upon successful NEPA review.

31.     The Solicitation also contemplated that, in requiring a minimum service life of 20 years, certain technologies applied in the NGDVs today may lapse with the creation of new and emerging innovations.  *Id*.  Therefore, and in accordance with USPS's objective to "maintain a modern fleet" with "sustainable operations[,]" the Solicitation required offerors to submit an Emerging Technologies Roadmap outlining their timeline to adapt their proposed NGDVs to developing technologies.  *Id*.  USPS identified a primary interest in "alternative fuel systems and autonomous systems" and accordingly committed to "evaluate each offeror's Roadmap, and any other initiatives identified by the offeror pertaining to emerging vehicle technologies, with a focus on . . . 1. Alternative Fuel Capability [and] . . . 2. Autonomous Vehicle Capability."  *Id*.  The Agency stated it was "dedicat[ed] to sustainable business practices" and therefore offerors must "demonstrate and document [their] capability to provide for and design a realistic path towards alternative fuel usage options for the NGDV vehicle."  *Id*.

32.     Likewise, the Agency committed to "embrac[ing] sustainable practices and environmental responsibility, and encourag[ing] suppliers to improve their environmental sustainability practices in the performance of this contract."  *Id*. at 48.  Therefore, "[t]he Postal Service encourage[d] supplier[s] to develop and propose innovative sustainability business practices and offer goods and services that help the Postal Service operate in a more environmentally sustainable manner."  *Id*.  Such practices could include the "replacement of materials used in performance with more sustainable materials [or a] combination of sustainable materials with other materials that lead to reductions in the total cost of ownership."  *Id*.

### *The Solicitation: Evaluation Criteria*

33.     The USPS intended to employ a combination of factors to evaluate offers and ultimately determine which offeror would deliver the best value to the USPS.  Solicitation, Attachment 7 at 1.

34.     The "best value" analysis required the USPS to weigh "total cost of ownership, technical evaluation results, and risk[,]"  with the technical evaluation taking priority.  *Id*.

35.     Total Cost of Ownership required consideration of acquisition costs, maintenance costs, fuel costs, and charging infrastructure costs.  *Id*.

36.     The Technical Evaluation Factors, described further below, were (in descending order of importance): Design Quality and Technical Approach, Supplier Capability, and Past Performance, each of which comprised multiple subfactors.  Solicitation, Attachment 7 at 1–2.

37.     Per the Solicitation, the combined Technical Evaluation Factors would be more important than Total Cost of Ownership in ultimately calculating the best value to the USPS.  *Id*. at 1.  Accordingly, the Solicitation contemplated that the USPS might select a higher-rated, higher-priced proposal if the Contracting Officer determined that the technical superiority of the higher-priced offer outweighed the price difference.  However, "the Postal Service [would] *not* make an award at a significantly higher price to achieve slightly superior performance."  *Id*. (emphasis added).

38.     The Solicitation also stated that the USPS might "evaluate offers and award a contract without discussions with offerors" but that "[d]iscussions may be conducted if the Postal Service determines they are necessary."  Solicitation at 9, Provision 4-1(g).

*Technical Evaluation Factor 1: Design Quality and Approach*

39.     To evaluate offerors' Design Quality and Technical Approach—the most important Technical Evaluation Factor—the USPS committed to consider proposals' (i) Reliability, (ii) Maintainability, (iii) Fuel Economy and Emissions, and (iv) Safety and Ergonomics.  Subfactors (i) and (ii) were to be equally important, and each more important than the latter two.  Solicitation, Attachment 7 at 1.

40.     The Agency would assess the Reliability of offerors' proposed NGDVs based on the "clarity, completeness, and merit of [their] specific features, materials, assembly techniques, sourcing, and quality control strategies." *Id.*  Ultimately, this subfactor would assess whether offerors' proposed NGDVs could meet the 20-year service life target.

41.     The Agency would assess Maintainability based on "[t]he completeness and quality of the offeror's description of how specific design features, materials, assembly and/or operating characteristics will lead to reduced maintenance[,]" including any on-board self-diagnostic or monitoring capability, as well as service timing and procedures.  *Id.*

42.     The USPS would assess Fuel Economy and Emissions based on "[t]he completeness of description and projected value of [the] offeror's features that focus on improving fuel economy and reducing emissions[,]" including data to support fuel economy and emissions performance over the proposed NGDV's service life.  *Id.*

43.     Finally, USPS would assess Safety and Ergonomics based on "[t]he completeness, feasibility, and potential safety value of [the] offeror's various design features, systems, and components that focus on improving safety of operations and minimizing carrier accidents[,]" such as "features that increase the efficiency of loading, unloading, curbside delivery, package delivery and delivery activities." *Id.*

*Technical Evaluation Factor 2: Supplier Capability*

44.     To evaluate offerors' Supplier Capability, the Agency would consider their proposals' (i) Engineering Capability, (ii) Production and Delivery, (iii) Service and Parts, and (iv) Quality.  Subfactors (i) through (iii) were to be equally important, and each more important than subfactor (iv).  Solicitation, Attachment 7 at 2.

45.     The Agency would assess Engineering Capability based on "[a]vailable resources, qualified personnel, and facilities for production design, development, and warranty support." *Id*.  The USPS would also evaluate offerors' "[c]apability to develop and adapt emerging technologies for the NGDV design, including *a demonstrated path to alternat[iv]e fuel vehicles*, *improved fuel efficiency*, increased safety, increased delivery efficiency, and autonomous vehicle technologies." *Id*. (emphasis added).

46.     The Agency would assess Production and Delivery based on an offeror's "[a]bility to produce NGDVs in accordance with [its] proposed production schedule, including a focus on the offeror's production facilities and ability to effectively scale into production." *Id*. Offerors should supply details of their production strategy, including an explanation of their existing and needed resources to mass-produce the NGDV, ability to incorporate design changes, use of energy efficient operations, and capacity to deliver the NGDVs on schedule. *Id*.

47.     Next, the Agency would assess Service and Parts based on offerors' "[p]resent and future capability to provide consistent service support and parts during the NGDV lifecycle." *Id*.

48.     Finally, the USPS would assess Quality based on offerors' "[e]xperience with and evidence of [their] quality management system and the quality management system of [their] key partners/subcontractor(s)." *Id*.  This would include consideration of offerors' key quality

management personnel, and history of "quality management, corrective action, and continuous improvement programs." *Id*.

*Technical Evaluation Factor 3: Past Performance*

49.     To evaluate offerors' Past Performance, the USPS would consider their Prototype Performance and Prior Performance, with the former carrying greater importance.

50.     The Agency would assess offerors' Prototype Performance "as demonstrated by the Postal Service's testing and observations during the NGDV Prototype Phase, including validation of subsystem reliability, vehicle safety, fuel economy, acceptance testing validation, break-in resistance, cold weather adaptability, and any other relevant performance tests performed by the Postal Service." *Id*.

51.     The Agency would assess offerors' Prior Performance based on the "[e]xtent and quality of offeror and key partners/subcontractor(s)['] past performance in both research/development and design/production of vehicles[,]" including performance on prior government and commercial contracts of similar type and scope. *Id*.

***Workhorse's Proposal: Submission and Summary***

52.     Workhorse submitted a timely and fully-compliant proposal in response to the Solicitation on July 14, 2020.

53.     Workhorse proposed an all-electric vehicle (the "Production Vehicle") designed from scratch precisely to meet or exceed the USPS's stated requirements and was optimized for user safety, carrier ergonomics, and future enhancement.  In brief, Workhorse developed its Prototype Vehicle and, following months of rigorous testing by Workhorse and the USPS, upgraded it with countless modifications, improvements, and additional features to ultimately propose an ultramodern, fully electric vehicle powered by an ████████████████████

14

████████████████████████████████████ among other strengths.  Technical Proposal,

Tab A at 9.  In addition, Workhorse's Production Vehicle is built to ████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████. *Id*. at 12.

54.     Pursuant to the Solicitation, Workhorse submitted a Business Proposal and

Technical Proposal, which illustrated Workhorse's firm compliance with the Solicitation's

requirements and adherence to the evaluation criteria: the Technical Evaluation Factors

(comprising multiple subfactors described below), Total Cost of Ownership, and Risk.

*Technical Evaluation Factors*

55.     With respect to Design Quality and Technical Approach, Workhorse demonstrated

the reliability, durability, and safety of its fully electric vehicle, which it developed "entirely to

the NGDV specification from the ground up rather than from an existing commercial platform."

Technical Proposal, Tab B at 5.  As such, Workhorse designed its Production Vehicle to

maximize safety, durability, maintainability, and longevity and diminish maintenance time and

costs.  Key features optimizing its reliability and safety include: (i) minimum number of vehicle

systems; (ii) few wear components; (iii) 20-year service life via durable components; (iv)

drivetrain redundancy; (v) guaranteed delivery of parts; (vi) increased vehicle availability due to

the absence of an internal combustion engine; (vii) flexible turning and strong visibility; and

(viii) full-time all-wheel drive.  *Id*. at 7–11; 49.  Moreover, Workhorse's fuel economy and

emissions are pristine, offering a battery powered, zero carbon emissions vehicle that consumes a

mere fraction of the energy required for conventional and hybrid models.  *Id*. at 37.

56.     With respect to Supplier Capability, Workhorse described its engineering

capabilities, including its personnel and systems dedicated to production design, development,

warranty and service support, its production facilities, and its continuing efforts to develop and adapt emerging technologies for its electric vehicles. *See* Technical Proposal, Tab C at 8, 10–16. In accordance with the Solicitation, Workhorse also submitted its Emerging Technologies Roadmap, detailing the proprietary technology features already built into its NGDV design and others that may be incorporated, including ████████████████████████████████ ██████████████████. *See id.* at 19–29.  For example, the Workhorse Production Vehicle is already ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████. *Id.* at 20–21.  Moreover, since the Production Vehicle is already fully electric, Workhorse does not need to consider how to adapt it to electric energy, but can focus on other innovative ways to improve its energy usage. *Id.* at 20, 28.

57.     With respect to Past Performance, Workhorse summarized the testing results of its Prototype Vehicle during the Prototype Phase, as well as planned modifications and enhancements to address any areas for improvement in the Production Vehicle. *See generally* Technical Proposal, Tab D at 1–21.  Next, Workhorse identified its prior performance in the research, development, design, and production of vehicles, as well as that of its key partner, █████████████████████████████████████████████████████. *See id.* at 22–41 (describing active contracts within the past five years).  Workhorse's strategic partnership with ████████████████████ brings many years of experience implementing successful, on-time startups for an array of the world's premier auto and truck manufacturers.

58.     Workhorse also identified alliances with other key partners that optimize its proposal's cost and quality, such as ████████████████████████████████████████

*Total Cost of Ownership*

59.     Workhorse demonstrated throughout its proposal that the Production Vehicle's Total Cost of Ownership is comparatively low.  For example, Workhorse's fleet of electric delivery vehicles currently in operation—which together have traveled millions of miles through varied terrain, climate, and duty cycles—demonstrate acquisition costs commensurate with those of conventional gas-fueled vehicles, but offer a ██ percent saving in fuel expenses and a ██ percent improvement in fuel efficiency, amounting to about ███████ in savings over ██████ versus a standard gasoline alternative.  Technical Proposal, Tab C at 17.

60.     Cognizant of concerns associated with electrifying the USPS's vast fleet, Workhorse also submitted an unsolicited proposal by ████████████████████ ███████, a potential Workhorse subcontractor, which detailed a comprehensive plan for ████████████████████████████████████████ ██████████████  *See generally* Technical Proposal, Tab F.  Significantly, ████████████ one of the largest electric power holding companies in the United States, would be willing to finance the construction of the charging infrastructure.  ████████████ has also committed to providing the USPS with an ████████████████████████ that would house the NGDVs, to confirm the savings associated with deploying such a charging infrastructure, at ████ ██████████.  *See* Proposal at Tab F.

### ***Workhorse's Proposal: Discussions and Updates***

61.     Following Workhorse's proposal submission, the USPS conducted discussions with Workhorse.  As set forth in the USPS Supplying Principles and Practices Manual (the

"Procurement Manual"), the procurement evaluation team must prepare a report of major strengths and weaknesses associated with the offerors' proposals upon their initial review. *See* USPS Supplying Principles and Practices Manual § 2-31.3. That report is then used to help the purchasing team "conduct discussions and potential negotiations so that the supplier(s) offering the best value to the Postal Service are selected." *Id.* The Contracting Officer holds discussions to "[a]llow for the clarification of matters contained in a proposal that raise questions regarding acceptability or proposal evaluation score" and to "[a]ddress suspected mistakes or questionable assumptions." *Id.* § 2-37.1.

62.     On September 3, 2020, the Contracting Officer sent offerors, including Workhorse, "discussion questions which request clarifications or identify weaknesses within your proposal for which additional information is needed." *See* Sept. 3, 2021 Email from Delores B. Waters to Julian Mallett re: NGDV Production Program – Oral Discussions (Workhorse). The document provided to Workhorse was two pages long, ending with two questions for Workhorse: "What is the GVWR for the NGDV vehicles?" and "What are the warranty [sic] for all vehicle components?" Deficiency List at 2. The list provided "[e]xamples of the areas of deficiency" but indicated that there were additional, unstated issues. *Id*. The identified issues were short and non-descript, and the USPS did not indicate that any were "major" or rendered Workhorse's proposal technically unacceptable.

63.     On September 25, 2020, Workhorse submitted a 99-page Deficiency Response to the Contracting Officer, providing clarification and data in response to each item on the list and answering the listed discussion questions. *See* Workhorse Response to USPS NGDV Proposal Deficiency Report at 1. For example, as requested, Workhorse provided additional information regarding its prior performance, including contact information for references, such as the ███

████████████████████, who could speak to Workhorse's ability to manufacture efficient and sustainable all-electric vehicles for large-scale commercial delivery.  *See id*. at 79. In addition, Workhorse provided a table summarizing the areas of past experience of Workhorse and ██████████████████████████, to demonstrate the vast and tested production capabilities of Workhorse's leadership and partners.  *See id*. at 82.  In sum, Workhorse addressed every purported issue the USPS identified during this stage of discussions.

64.     On October 8, 2020, the USPS invited Workhorse to conduct oral discussions via videoconference on Zoom.  During the Zoom meeting, Workhorse gave a presentation summarizing the information it had provided in its response to the USPS's list.  While on the Zoom call, the USPS asked one question about the vehicle's battery warranty, and did not otherwise ask any questions or provide any feedback to Workhorse following the presentation. On October 9, 2020, Workhorse called the Contracting Officer to ask for feedback.  On that phone call, the Contracting Officer stated that the USPS had received all of the information it needed to complete the work of the Technical Evaluation Committee.  When asked about the limited number of questions posed to Workhorse, the Contracting Officer replied that, due to receipt of Workhorse's Response to the USPS NGDV Proposal Deficiency Report and related Zoom presentation, no further questions on the technical evaluation should be expected.  The Contracting Officer did indicate that Workhorse might receive additional discussion questions regarding other elements of its proposal.

65.     On October 21, 2020, the Contracting Officer transmitted via email to Workhorse a list of discussion questions, requesting clarification on Workhorse's NGDV Production Proposal Data Request Workbook submission.  The document was about two-thirds of a page long, containing eight short questions and requests for additional data and clarification in certain

areas.  Two questions related to Workhorse's cost breakdown, and six related to the Maintenance tab of Workhorse's proposal.  *See* USPS Business Proposal Related Questions at 1.   The USPS did not indicate that any of the identified issues were "major" or award-prohibitive.  *See id.*  On October 28, 2020, Workhorse submitted a seven-page response to the USPS, which contained responses to all of the questions contained in the October 21 email and provided additional attachments and information as requested.  *See* Workhorse Response to USPS Business Proposal Related Questions.  USPS did not issue any additional questions or raise any additional deficiencies to Workhorse after Workhorse submitted this response.

### *Award and Debriefing*

66.     On February 23, 2021, Workhorse received a notice of award from the contracting officer, indicating that the USPS had made a single IDIQ contract award to Oshkosh for the provision of NGDVs over ten years, with an initial $482 million payment for Oshkosh to finalize its production design.  The estimated value of that contract is $3.1 billion.

67.     It quickly became apparent that, for the Production Phase, Oshkosh proposed an *entirely different* vehicle than the Ford Transit-based vehicle that it had submitted—and that the Agency had tested at great length and expense—for the Prototype Phase.  This new proposed design, however, remains a conventional internal combustion engine vehicle, which Oshkosh claims can be retrofitted to be electric.  In fact, Oshkosh acknowledged in a November 2020 filing with the Securities Exchange Commission that, while sales of electric-powered vehicles are increasingly important in the industry, Oshkosh "may not have the expertise or resources to successfully address these pressures on a cost-effective basis or at all."  Oshkosh Corp., 2020 Annual Report (Form 10-K), at 32 (Nov. 18, 2020).

68.     This award came shortly after President Biden's executive order of January 27,

2021, directing the procurement of "clean and zero-emission vehicles for Federal, State, local,

and Tribal government fleets, including vehicles of the United States Postal Service."  Exec.

Order No. 14008 § 205 at 6 (January 27, 2021).

69.     Per Oshkosh, the $482 million initial payment is necessary to "initiate engineering

efforts to finalize the production vehicle design, and for tooling and factory build-out activities

that are necessary prior to vehicle production."  *USPS Selects Oshkosh Defense for Next*

*Generation Delivery Vehicle Fleet*, Oshkosh Corp. (February 23, 2021),

https://oshkoshdefense.com/usps-selects-oshkosh-defense-for-next-generation-delivery-vehicle-

fleet/.

70.     According to the notice of award, USPS "determined that [Oshkosh] offered the

best value to the Postal Service based on the solicitation's stated evaluation criteria, taking into

account the technical factors in the solicitation, the evaluated total cost of ownership, and risk."

Notice of Award at 1.

71.     Per Postmaster General Louis DeJoy's congressional testimony on February 24,

2021, only 10 percent of the new Oshkosh fleet would be electric unless the USPS receives an

additional $3 or $4 billion dollars in funding.  *See* Legislative Proposals to Put the Postal Service

on Sustainable Financial Footing: Hearing Before the Comm. on House Oversight and Reform.

117 Cong. (Feb. 24, 2021) ("Testimony of Postmaster Gen. Louis DeJoy").

72.     On March 1, 2021, Senator Sherrod Brown and Representatives Tim Ryan and

Marcy Kaptur wrote a letter to President Biden, expressing concern over Postmaster General

DeJoy's February 23 remarks and the USPS's decision to award an initial contract to provide up

to 165,000 new postal vehicles over the next decade without any commitment to making these

vehicles either hybrid or 100 percent electric.  The letter also requested that the contract be delayed until a thorough review is conducted to determine: "1) [that] there was not inappropriate political influence in the process, and 2) that the proposed contract is consistent with [President Biden's] Executive Order on Tackling the Climate Crisis at Home and Abroad."  Letter from Sherrod Brown, U.S. Senator, et al., to President Joseph R. Biden 2 (Mar. 1, 2021).

73.     Following the USPS's announcement of the award to Oshkosh, it fielded additional questions concerning the contract and Oshkosh's ability to integrate electric vehicles into its otherwise fossil-fueled fleet.  In a March 11, 2021 letter to Congress, Postmaster General DeJoy indicated that the USPS did not plan to place any orders of Oshkosh's vehicle until February of 2022 and the first NGDVs would not be on the streets until sometime in 2023. Additionally, DeJoy indicated that, based upon the USPS's current financial condition, it could only commit to electrifying ten percent of the Oshkosh vehicles ordered, but may reevaluate if its financial conditions change.  For example, DeJoy stated, the USPS could commit to electrifying a majority of its fleet within the next ten years with significantly increased congressional funding, noting that an estimated additional cost of "approximately $8 billion is needed to electrify [its] delivery vehicle fleet in a shorter time frame to the maximum extent that is operationally feasible."  Letter from Louis DeJoy, Postmaster Gen., USPS, to Sen. Gary C. Peters, Chairman, Sen. Comm. on Homeland Security and Gov. Affairs, et al. 2 (Mar. 11, 2021).

74.     Following the award announcement, Workhorse timely requested a debriefing, which was held on March 3, 2021.  At the debriefing, the USPS described certain strengths and weaknesses it identified in Workhorse's proposal, but declined to provide any information regarding the comparative strengths and weaknesses of the awardee's proposal.  For instance, while the USPS stated that Workhorse's proposal was rated "second" on Total Cost of

Ownership, the USPS declined to disclose which offeror was rated first or third or the analysis that led to such a rating.  The USPS did, however, indicate that Workhorse's proposal was rated less favorably than Oshkosh's on the Technical Evaluation Factors.

### Workhorse's Disagreement and the USPS's Denial

75.     Shortly thereafter, Workhorse submitted a good faith "disagreement" to the USPS in accordance with 39 CFR § 601.107, thus triggering a 10-day resolution period in which the USPS is required to attempt to resolve the disagreement "by mutual agreement."  In its disagreement, Workhorse requested that the USPS withdraw the award to Oshkosh and make a new award decision based on a rational best value analysis in accordance with the terms of the Solicitation.

76.     During that 10-day period, however, the USPS made no contact with Workhorse at all, much less any effort to come to a mutually agreeable resolution.  Instead, the USPS spent the resolution period authoring a lengthy screed aggressively attacking Workhorse and its years-long effort to assist the USPS in developing a first-rate NGDV.  The USPS delivered its scorched-earth "resolution" decision to Workhorse on the evening of the tenth day, March 22, 2021 (the "Response Letter").  The USPS denied Workhorse's disagreement.

77.     The Response Letter revealed that the USPS had identified numerous purported "critical" deficiencies in Workhorse's proposal that it had not previously raised or otherwise indicated as award-prohibitive during discussions.  For example, while the USPS later claimed that "███████████████████████████████████████████████████████ ████████████████████████████████████," neither of these concerns were described to Workhorse during discussions nor did the USPS inform Workhorse that it considered its service plan unacceptable.  *See* Response Letter at 17.

78.     The Response Letter also revealed a wealth of information not previously shared with Workhorse concerning the USPS's evaluation process and results, and ultimate award to Oshkosh.

79.     For example, the Response Letter revealed that Oshkosh had proposed not one but two vehicles during the Production Phase: one for an internal combustion engine ("ICE") vehicle and one for a battery electric vehicle ("BEV"), neither of which was the vehicle Oshkosh had presented during the Prototype Phase.  In total, there were four offerors, with Oshkosh submitting two proposals.

80.     According to the Response Letter, the USPS ultimately determined that Oshkosh's proposals presented the best value, and therefore awarded one contract to Oshkosh for its internal combustion engine vehicle and/or its electric vehicle, "at whatever mix the Postal Service selected."  *Id*. at 4.

81.     For the first time, the USPS revealed the results of its technical evaluation, total cost of ownership evaluation, and best value tradeoff analysis.

USPS's Best Value Tradeoff Analysis Results[3]

| Supplier Name | Technical Score | Technical Ranking | TCO | TCO Ranking | Best Value Ranking |
|---|---|---|---|---|---|
| Oshkosh (ICE) | ■■■■■ | 1 | ■■■■■ | 1 | 1 |
| Oshkosh (BEV) | ■■■■■ | 2 | ■■■■■ | 4 | 2 |
| ■■■■■ | ■■■■■ | ■■■■■ | ■■■■■ | ■■■■■ | ■■■■■ |
| Workhorse (BEV) | ■■■■■ | 5 | ■■■■■ | 2 | 5 |

---

[3] This chart, taken from the Response Letter, indicates that there were four total offerors; however, the Response Letter indicates elsewhere that there were, in fact, three offerors.

82.     Aside from its remarkably hostile tone, the USPS's Response Letter is full of misleading statements, mischaracterizations, distortions, and strawman arguments.  There can be little doubt that it was written for an audience other than Workhorse.

83.     Despite all of its bluster, the USPS did not dispute key points made in Workhorse's disagreement letter.

84.     First, the USPS did not dispute that it chose for production a vehicle that had not undergone the USPS's rigorous prototype testing.  The USPS essentially acknowledged that Workhorse is correct that Oshkosh put forward as its NGDV prototype a customized Ford Transit that could not possibly meet the USPS's NGDV requirements, and then abandoned it for a completely different vehicle for production.  The USPS did not explain how that was at all consistent with its approach to the NGDV Program, which from the outset was to use prototype testing to narrow the field of contenders, after which the manufacturers would use the prototype testing results to refine their designs and compete for the production contract.  Why the USPS jettisoned that sensible approach remains a mystery.  Nor did the USPS explain how its selection of an un-prototyped vehicle could be squared with the Solicitation's evaluation scheme, which made "prototype performance" a key evaluation factor.

85.     Second, the USPS did not dispute that, unlike Workhorse, Oshkosh has never built a last-mile delivery vehicle, while Workhorse has successfully done so, in the process winning the confidence of such companies as ███.  That industry leaders in last-mile delivery have committed hundreds of millions of dollars to purchase Workhorse-designed and -built vehicles for their fleets completely undermines the USPS's disparagement of Workhorse as a "startup" company without the experience or capability to produce the NGDV.  In fact, although it has

experience building vehicles for the military, Oshkosh has built no last-mile delivery vehicles and no electric vehicles, making it the true startup in the USPS competition for delivery vehicles.

86.     Third, the USPS did not dispute that Oshkosh has never produced an electric vehicle. Indeed, Oshkosh did not even attempt to put an electric vehicle through the USPS's prototype testing.  The USPS is gambling that not only will Oshkosh's maiden foray into electric vehicle manufacturing be successful, but also that Oshkosh will succeed while at the same time producing hundreds of thousands of a gas-burning version.[4]

87.     The disingenuousness of the USPS's diatribe about Workhorse is amply demonstrated by its treatment of the non-disclosure agreement ("NDA") that the USPS required offerors to sign in order to compete for the NGDV contract.  In public filings, the lobbying firm of K&L Gates admitted to lobbying on Oshkosh's behalf on "[i]ssues related to Next Generation Delivery Vehicles (NGDV)" in 2020, when the competition for the NGDV production contract was taking place.  The lobbying was directed at the U.S. House of Representatives, The White House, the USPS, and the Postal Regulatory Commission.  K&L Gates' public filings also reveal that during this same time period it lobbied on behalf of Oshkosh's partner, Ford Motor

---

[4] The USPS mischaracterized Workhorse's disagreement letter as arguing that the USPS was *required* to select an electric vehicle for the NGDV production contract.  Response Letter at 5.  To the contrary, Workhorse contends that the USPS made a misguided and irrational decision that the Oshkosh ICE vehicle is a better value for the USPS for the next 20 years than an all-electric vehicle.  That the decision is irrational is evidenced by such things as Executive Order 14008, which reflects the federal government's determination that electric vehicles are preferable for government fleets; the fact that the last-mile delivery industry is overwhelmingly shifting to electric vehicles over ICE vehicles for their fleets because of their many benefits, including lower total cost of ownership; the fact that the USPS had perfectly viable proposals for an electric NGDV, including from Workhorse; and the likelihood that the required NEPA review is almost certainly going to call into question whether the selection of an ICE vehicle over a feasible electric alternative one is environmentally sound.

Company, in regard to the NGDV program.  Ford lobbied the U.S. Senate, the U.S. House of Representatives, the White House, and the USPS.[5]

88.    Oshkosh's and Ford's lobbying clearly violated not only Oshkosh's NDA with the USPS, but also the "Ground Rules for Supplier Operational Visits & Protection of Postal Service Program Information" (the "Ground Rules") that the USPS required offerors to sign and abide by.  These blatant breaches appear to have had zero effect on the USPS's decision to award Oshkosh a contract worth up to $3.1 billion.  When Workhorse raised this lobbying activity in its disagreement letter to the USPS's contracting officer, the USPS apparently made no effort to investigate, but instead inaccurately responded that "[t]hese allegations are unequivocally false" and claimed that raising them showed Workhorse's "lack of credibility and candor with the Federal government."  Response Letter at 1 n.1.

89.    In contrast to its complete disinterest in the Oshkosh team's NGDV lobbying campaign aimed at every entity involved in the award decision and funding of the procurement, in violation of the NDA and the Ground Rules, the USPS castigated Workhorse for making innocuous and good-faith public statements confirming its participation in the NGDV program.[6]  The USPS claimed that Workhorse's alleged breaches of the NDA and Ground Rules call into question Workhorse's suitability to be a contractor for the USPS.  The USPS further suggested that Workhorse may have been denied the production contract on this ground even if the USPS had rated its proposal the best value.  The Agency made clear that it closely policed Workhorse's

---

[5] This information is publicly available at https://lobbyingdisclosure.house.gov/.

[6] The USPS even resorted to parroting the allegations of opportunistic securities fraud lawsuits, which are based upon extreme and out-of-context interpretations of public statements made by Workhorse.  The USPS's eager adoption of those unsubstantiated allegations as truth shows that the USPS made no effort to fairly consider the legitimate issues about its award decision but rather is grasping at every straw it can find to criticize Workhorse.

public statements and considered any apparent violation of the NDA to be grounds for rejecting Workhorse's proposal.  Yet it professes ignorance about Oshkosh's publicly reported NGDV lobbying campaign and attacks Workhorse for even raising the subject.  The double standard on display here is as troubling as it is obvious.  This disparate treatment alone calls into question the impartiality of the USPS's consideration of Workhorse's proposal and unequivocally reveals the USPS's Response Letter to be a disingenuous public relations document rather than a good faith effort to address the legitimate questions Workhorse raised about the award decision.

90.     Following this denial of Workhorse's disagreement, Workhorse initiated the instant protest.

## **Claims for Relief**

### *Count I*

***The USPS Misled and Failed to Conduct Meaningful Discussions with Workhorse about Alleged Proposal Deficiencies, Violating the USPS Procurement Manual and Prejudicing Workhorse.***

91.     Workhorse hereby incorporates by reference all preceding paragraphs of this Complaint as though set forth fully herein.

92.     The USPS violated its own Procurement Manual and the fundamental fairness of the evaluation process by failing to conduct meaningful discussions with Workhorse and by misleading Workhorse as to the breadth and nature of the USPS's purported concerns about Workhorse's proposal.  The USPS Supplying Principles and Practices Manual requires that, once the evaluation team reviews proposals, it must prepare a report of major strengths and weaknesses associated with the offerors' proposals.  *See* USPS Supplying Principles and Practices Manual at § 2-31.3.  The report's assessment of major strengths and weaknesses of each proposal is then used to help the purchasing team "conduct discussions and potential

negotiations so that the supplier(s) offering the best value to the Postal Service are selected." *Id.*

Discussions during the proposal evaluation stage are held by the Contracting Officer to "[a]llow

for the clarification of matters contained in a proposal that raise questions regarding acceptability

or proposal evaluation score" and to "[a]ddress suspected mistakes or questionable assumptions."

*Id.* § 2-37.1.  The Solicitation stated that the USPS "may evaluate offers and award a contract

without discussions with offerors" but that "[d]iscussions may be conducted if the Postal Service

determines they are necessary."  Solicitation at 9, Provision 4-1(g).

93.     The USPS chose to conduct discussions with Workhorse during the evaluation

phase.  As described above, on September 3, 2020, the USPS sent offerors, including Workhorse,

an admittedly incomplete list of "questions and weaknesses."  The list provided to Workhorse

was a mere two pages long, with brief sentences that did not contain any description of the

severity of those listed weaknesses or any indication that the USPS considered some of the issues

so problematic that they would render the proposal technically unacceptable.  Indeed, the USPS

did not indicate that any of the listed issues were "major" at all.

94.     The USPS's later discussions with Workhorse also failed to adequately inform

Workhorse of the alleged scope and seriousness of the USPS's concerns.  Workhorse's oral

discussion with the USPS on October 8, 2020 was one-sided, with Workhorse giving a

presentation in response to the USPS's issues list, and the USPS asking one, brief question and

otherwise failing to provide any feedback or raising concerns at all.  On the October 9, 2020

phone call with Workhorse, the Contracting Officer herself did not identify any areas of concern

to Workhorse regarding its proposal, and said that the USPS did not anticipate needing any

additional information from Workhorse for the technical evaluation.  The discussion questions

that the USPS sent to Workhorse on October 21, 2020 similarly did not raise the purportedly

major issues that the USPS later cited as abundant and serious in its Response Letter.  In fact, none of those eight brief questions was characterized as "major" or otherwise so serious as to merit a score of ███ for any of the evaluation factors.

95.     The issues list and subsequent discussions that the USPS engaged in with Workhorse did not constitute proper discussions per the USPS's Procurement Manual and fundamental notions of fairness.  Instead, the list, oral discussions, and discussion questions failed to adequately inform Workhorse of the USPS's concerns about Workhorse's proposal and the nature and breadth of those concerns.  This was improper.  As a result, the USPS's barebones issues list and lack of meaningful discussions prevented Workhorse from being able to sufficiently address the USPS's concerns so as to be considered fairly for the award.  This caused prejudice to Workhorse, as the perceived weaknesses in Workhorse's proposal were factored heavily into the evaluation team's best value tradeoff analysis.  Accordingly, the USPS's failure to adequately conduct discussions with Workhorse violated the USPS's own Procurement Manual and the fundamental fairness of the evaluation process.  Workhorse was prejudiced by this failure, because it otherwise would have been able to substantially improve its proposal by addressing the USPS's purported concerns.  This would have resulted in a significantly higher technical score.

### Count II

### The USPS Unequally, Arbitrarily, and Prejudicially Evaluated the Proposals.

96.     Workhorse hereby incorporates by reference all preceding paragraphs of this Complaint as though set forth fully herein.

97.     The USPS's evaluation process that led to the award decision could not possibly have been in accordance with the evaluation and selection criteria set forth in the Solicitation, the

USPS's stated goals and priorities for this procurement, or common sense.  No rational analysis could conclude that the best value for the USPS's fleet for the next twenty years is a vehicle that has yet to be built (much less prototyped), uses an internal combustion engine rather than an emissions-free electric motor, and that almost certainly will be more expensive to own and operate than Workhorse's existing and tested vehicle.

98.     The Solicitation committed the USPS to make awards to "the offeror(s) whose proposal offers the best value to the Postal Service," and noted that "[b]est value offer(s) will be determined after the completion of the evaluation phase by weighing total cost of ownership, technical evaluation results, and risk."  Solicitation, Attachment 7 at 1.  If the evaluation scheme prescribed by the Solicitation had been followed, Workhorse's proposal would clearly have been found to be the best value, the least risky, and the clear, superior choice for the government's largest fleet.

### Count II.A: The USPS Failed to Evaluate Properly Workhorse and Oshkosh's Proposals Under the Technical Evaluation Factors Commanded by the Solicitation.

99.     The USPS's Response Letter included information that the USPS refused to provide at the debriefing held on March 3, 2021.  In particular, the USPS included in its Response Letter general scoring and ranking information that it claimed at the debriefing it was not allowed to provide. The USPS still has not described how the scoring system worked or how the supposed strengths and weaknesses of the proposals were translated into the numerical scores USPS discusses in its letter.  Even based on the information that the USPS has decided to reveal, however, the technical evaluation either was not conducted in accordance with the Solicitation's requirements, was fundamentally unreasonable, or both.

100.     According to the Solicitation, for purposes of the best value determination, the

Technical Evaluation Factors, when combined, were to be considered more important than the

Total Cost of Ownership.

Factor 1: Design Quality and Technical Approach

Subfactor 1.1: Reliability

101.     The USPS asserted that it assigned Workhorse ████████████████████████

this subfactor.  According to its Response Letter, the USPS assessed that Workhorse's "major

weakness on reliability was [i] █████████████████████████████████████

████████████████████████████."  Response Letter at 12.  In addition, the USPS

said that it assigned Workhorse a weakness ████████████████████████

████████████████████████.  Response Letter at 13.

102.     The USPS's negative evaluation of Workhorse's proposal concerning Reliability

is contrary to the terms of the Solicitation.  With respect to item (i), the Solicitation states the

USPS would evaluate Reliability based on:

> [t]he clarity, completeness and merit of [an] offeror's description of how specific
> features, materials, assembly techniques, sourcing, and quality control strategies
> will improve the reliability and durability of the vehicle [and an] . . . offeror's
> reliability improvement strategies needed to ensure that the design meets the service
> life target.

Solicitation, Attachment 7 at 1.  Nowhere in this evaluation criteria did the USPS ask for ██

████████████████████████████—for allegedly lacking.  Therefore, it

appears that the USPS unilaterally imposed this make-or-break criteria after issuing the

Solicitation, and then expected Workhorse to meet the new, unstated goalpost.

103.     Furthermore, and contrary to the USPS's assertions, Workhorse *did* submit

████████████████████████████.  For example, Workhorse submitted the

████████████████████████████████████████

32

██████████████████████████████████████████████████████████

████████████████████████████████████████████. Technical Proposal,

Tab B at 7, 35.

104.    Likewise, the USPS faulted Workhorse for failing to provide ██████████

████████████████████████████████████████. Response Letter at 12.  In fact, Workhorse

*did* provide █████████████████████████████████████ as well as data from the

USPS-designed 24,000-mile durability test that was specifically developed to test the durability

of the Prototype Vehicles.  This was real-time data provided to the USPS under its own

supervision.  ████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

105.    █████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████.  *See* Technical Proposal, Tab B at 9–

13.

106.    In addition, unlike Oshkosh's production designs, Workhorse's proposed vehicle

already went through the USPS's own prototype testing procedures, during which the USPS had

the opportunity to test and assess these features itself.  The Agency's Response Letter touts the

thoroughness of its prototype testing, conducted over the course of almost two years "in a variety

of different climates, topography, population centers, and delivery environments" for "a broad

range of safety, efficiency, and durability" considerations.  Response Letter at 2.  The USPS then

stated that Oshkosh submitted its own testing data, but failed to explain how or why it concluded

that Oshkosh's testing of its own vehicle was equally as credible as the USPS's testing during the

Prototype Phase.  Workhorse should not be penalized for an alleged failure to submit ██████

████████  when (1) such data was never required under the Solicitation, and (2) other offerors,

including Oshkosh, likely submitted such data specifically because their prototype testing results

were no longer relevant to their new or revised production design.  Therefore, the USPS's

contention that ██████████████████████████  is demonstrably false.

107.    Next, with respect to item (ii)—Workhorse's ██████████████

██████████████████████████—the USPS stated in its Response

Letter that it assigned Workhorse significant weaknesses on this subfactor because ██████

████████████████████ Response Letter at 13.  The ██████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

██████████████

108.    Setting aside the apples-to-oranges comparison, the USPS's method was

impermissible under the Solicitation's evaluation scheme.  The Solicitation called for

consideration of an offeror's prototype performance under the Prior Performance factor.  By

evaluating prototype performance under the Design Quality and Technical Approach factor, the USPS impermissibly faulted Workhorse multiple times for the same ██████████ ████████████. This improperly elevated the importance of the prototype testing, in contravention of the Solicitation's evaluation methodology.

109.    Even so, the USPS is wrong. Workhorse did in fact submit ██████████ ████████████. *See* Technical Proposal, Tab E.05 at 26–30 (describing and picturing Workhorse's changes to the service and parking brake in the production design).  And, finally, the USPS is well aware that the "rollaway incident" pictured on page 13 of its Response Letter was not due to a parking brake failure.  Rather, the prototype vehicle was improperly left in "Drive" rather than "Park" and then abandoned by the driver, which caused it to roll uncontrolled into a ditch.  The USPS conveniently pictures the aftermath without reference to the cause.

<u>Subfactor 1.2: Maintainability</u>

110.    The USPS states that it assigned Workhorse the ██████████████████ on this subfactor because (i) ████████████████████████████████████ ███████████████████████████████████████████████████████ Response Letter at 14.

111.    The Solicitation dictated that the USPS would evaluate this factor based on a multitude of criteria.[7]  USPS apparently gave Workhorse a ██████████ because it purportedly

---

[7] "The completeness and quality of the offeror's description of how specific design features, materials, assembly and/or operating characteristics will lead to reduced maintenance. Practicality of special approaches taken that will result in more efficient servicing and maintenance of the vehicles. Completeness of the description and capability of any on-board self-diagnostic capability built into the vehicle—including provisions for monitoring emissions, safety, and other wear components on the vehicle. Clarity and completeness of any special and routine maintenance procedures, including an overview of maintenance or replacement intervals for major components. *Sufficiency of data and analysis* to validate claimed service intervals and expected lives of major components." Solicitation, Attachment 7 at 1 (emphasis added).

███████████████████████.  For example, the USPS falsely stated in its letter that

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Response Letter at 14.  This plainly ignores the footnote to the referenced graph, indicating that

data and cost analysis were discussed in Volume 1 of its proposal.  Technical Proposal, Tab B at

17.  Second, as stated above, nowhere in the Solicitation did the USPS actually request ████████

In largely basing its ██████████ of Workhorse's proposal on a purported ██████████ that

the Solicitation never required, the USPS violates the Solicitation's stated evaluation criteria and

fundamental fairness of the evaluation process.

Subfactor 1.4: Safety and Ergonomics[8]

112.    The USPS claimed that Workhorse earned ██████████ on this subfactor.

According to the USPS's Response Letter, its Technical Evaluation Team determined that

Workhorse's proposal had "██████████████" with respect to Safety and Ergonomics,

primarily including: ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ Response

Letter at 11.

113.    To begin with, ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

---

[8] USPS's Response Letter did not address Factor 1.3, Fuel Economy and Emissions, except to state that it was ████████████████████████████████████████████ ██████████████████ Response Letter at 11 n.44.

██████████.  While the USPS has not disclosed the scoring system it used, no rational system could reach such a conclusion.

114.    With respect to item (i), the USPS exhibits an inherent misunderstanding of Workhorse's proposal regarding its feasibility designations, which the USPS itself mandated in the Solicitation.  In its Response Letter, the USPS takes issue with Workhorse's description of how safety features would be built into its final production design.  Pursuant to the Solicitation, Workhorse ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████.  *See* Technical Proposal, Tab B at 56–58; Solicitation, Attachment 7 at 1 (committing the USPS to evaluate this subfactor based on "[t]he completeness, *feasibility*, and potential safety value of offeror's various design features, systems, and components that focus on improving safety . . ." (emphasis added)).

115.    Workhorse made perfectly clear that ██████████████████████████

██████████████████████  Technical Proposal, Tab B at 56 (emphasis added).  Ignoring this, the USPS claimed that Workhorse ████████████████████████████████

████████████████████  Response Letter at 11.  This rationale clearly contradicts Workhorse's explicit commitment to incorporate all identified safety features into its final production design.  The USPS simply misconstrues the "Feasible" and "Highly Feasible" designations—which Workhorse adopted straight from the Solicitation—to identify those safety features that already existed (thereby making them "Highly Feasible"), or required an update to the prototype vehicle ("Feasible").  At bottom, the USPS's failure to understand its own evaluation criteria resulted in ██████████████████████████████  for Workhorse.



116.    Next, with respect to item (ii), the USPS stated that Workhorse's revised proposal recommended design modifications that would ████████████████████████████ ███████████████████████████████████████████████ Response Letter at 11–12.  Following submission of Workhorse's proposal, the USPS identified certain Safety and Ergonomics concerns on September 3, 2020, which primarily related to ████████████████ ████████    In response, Workhorse commissioned ██████████████████████████ █████████████████████.  In addition to proposing modifications to correct purported shortcomings identified by the USPS, █████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████.  Workhorse provided these proposed alterations to the USPS during the proposal process.  It appears that the USPS ignored these alterations or misunderstood them, as they could not create the ███████████████ that the USPS cites as a primary reason for awarding Workhorse ████████████████████    Further, if these concerns were so ███████████████████ the USPS might have clearly indicated this during discussions, but did not.

Factor 2: Supplier Capability

Subfactor 2.1: Engineering Capability

117.    The USPS's assessment of Engineering Capability was supposed to be based on "[a]vailable resources, qualified personnel, and facilities for production design, development, and warranty support."  Solicitation, Attachment 7 at 2.  The USPS was also to evaluate offerors' "[c]apability to develop and adapt emerging technologies for the NGDV design, including a

demonstrated path to alternate fuel vehicles, improved fuel efficiency, increased safety, increased delivery efficiency, and autonomous vehicle technologies." *Id.*

118.    The USPS asserts that Workhorse received ███████████████████ on this subfactor.  Response Letter at 15.

119.    The USPS erred in its engineering capability analysis by faulting Workhorse for being a ██████████████████████████████ Response Letter at 15. This characterization ignores Workhorse's ███████████████████████████████ ██████████████████████████ that has demonstrated vast and tested production capabilities.  *See* Workhorse Response to USPS NGDV Proposal Deficiency Report at 82.

120.    Moreover, Workhorse has already demonstrated its "capability to develop and adapt emerging technologies for NGDV design."  Workhorse has a ██████████████ ██████████████████████████████████████████ ████████████  *See* Technical Proposal, Tab C at 6.  With hundreds of electric vehicles already in operation for companies such as █████████████, and millions of miles driven in real-life duty cycles and climates, Workhorse has already proven its ability to fuse safety and efficiency with emerging technologies.

Subfactor 2.2: Production & Delivery

121.    The USPS was required to assess Production and Delivery based on an offeror's "[a]bility to produce NGDVs in accordance with [its] proposed production schedule, including a focus on the offeror's production facilities and ability to effectively scale into production." Solicitation, Attachment 7 at 2.  Offerors were required to detail their production strategy, including an explanation of their existing and needed resources to mass produce the NGDV,

ability to incorporate design changes, use of energy efficient operations, and capacity to deliver the NGDVs on schedule.

122.    On this subfactor, the USPS again failed to consider appropriately Workhorse's strategic partnerships. ████████████████████████████ to ensure that it could meet or exceed NGDV contract objectives, *i.e.*, to design, produce, deliver, and maintain a high quality next-generation fleet while integrating technologies that drive efficiencies.  The USPS improperly downgraded Workhorse ██████████████████████████████

██████████████████████████████████████████ Response Letter at 16.  Workhorse, however, partnered with ████████████████,[9] a leader in assembly, sequencing, and machining that provides on-site assembly services for a variety of OEMs.  Not only does ██████████████████ have a demonstrated track record with projects of similar size and scale, Workhorse also has the facilities and staff to do so.

123.    The USPS incorrectly focused on Workhorse's partnership with ██████████████████ in concluding that Workhorse ████████████████████████

████████████████  In fact, the USPS's analysis of Workhorse's Production & Delivery capabilities is devoid of any mention of Workhorse's manufacturing plant in Union City, Indiana.[10]  The Union City facility is well-positioned geographically to reliably deploy the

---

[9] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

[10] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

NGDVs around the nation.  For instance, more than 105 Vehicle Maintenance Facilities

("VMFs") are located within a 500-mile radius of the Workhorse-owned facility, a one-day

drive.  These particular VMFs will receive more than ██████████████████████████

██.  Workhorse's alliance with ██████████████, and its ██████████████████

████████████████ provides secure scale-up capability to deliver the vehicles on schedule.

Through Workhorse's alliance with ██████████████ it would retrofit, staff, and manage

Workhorse's Union City NGDV assembly line and handle logistics and delivery of the NGDVs

to VMFs.

124.    The USPS also faulted Workhorse for including a ██████████ in its proposal

without providing ██████████████ Response Letter at 16.  The Solicitation, however, did

not require—nor did USPS ever request—██████████████████ Workhorse provided

████████████████████████████████████████████ the USPS-

designed 24,000 mile durability test that was designed to simulate the durability life of the

vehicle.  This was real-time data provided to the USPS under its supervision.  ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ Thus, the USPS again deviated from the terms of the Solicitation and improperly

downgraded Workhorse for failing to provide information that was not required by the

Solicitation's evaluation scheme, yet nevertheless was, in fact, provided.

<u>Subfactor 2.3: Service & Parts</u>

125.    The USPS was to assess Service and Parts based on offerors' "[p]resent and future capability to provide consistent service support and parts during the NGDV lifecycle." Solicitation, Attachment 7 at 2.

126.    The USPS again failed to consider both Workhorse's *and* its strategic partners' capabilities.  At the debriefing and in its Response Letter, the USPS stated that Workhorse's proposal was faulted ████████████████████████████████████████████ ████████████  Response Letter at 17.

127.    In its Response Letter, the USPS further claimed that Workhorse ██████ ████████████████████████████████████████████████████████████ ████████████████████████.  Response Letter at 17.  To the contrary, Workhorse's proposal included details of its intent to utilize ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████  *See* Technical Proposal Tab E.11.  ████████████████ ████████████████████████████████████████████ ████████████████████████  Solicitation, Attachment 7 at 2.

128.    In addition, the USPS faulted Workhorse for ████████████████████ ████████████████  Response Letter at 17.  However, nothing in the evaluation scheme required an offeror to ████████████████████████████.  Nevertheless, Workhorse's partnership with ████████████████ satisfied this undisclosed evaluation criteria.  Moreover, Workhorse would oversee all claims, which would be submitted

██████████████████████████████████████████████████████

████████████████████████████      *See* Deficiency Response at 63.  Again, the USPS's

evaluation of Workhorse's proposal was fundamentally flawed.

129.    Workhorse also described its present and future ability to provide consistent

Service and Parts during the NGDV lifecycle, including ████████████████████████

██████████████████████████████████████████████████████

████████      *See* Technical Proposal, Tab C at 53–59.  Unlike other offerors, Workhorse could

guarantee part availability throughout the contract because Workhorse designed its NGDV from

the ground up, with all parts, components, molds, and tools originating from and supplied by

Workhorse itself.  Technical Proposal, Tab C at 59.  And, equally unmatched, Workhorse's all-

electric vehicle requires only about ████████████████ compared to about 2,000 required in

an internal combustion vehicle.  Technical Proposal, Tab C at 59.  Accordingly, this should have

been a strength, not a weakness.

<u>Subfactor 2.4: Quality</u>

130.    Per the terms of its own Solicitation, the USPS was to evaluate Quality based on

offerors' "[e]xperience with and evidence of [their] quality management system and the quality

management system of [their] key partners/subcontractor(s)."  Solicitation, Attachment 7 at 2.

This included consideration of offerors' key quality management personnel, and history of

"quality management, corrective action, and continuous improvement programs."  *Id.*

131.    The USPS improperly faulted Workhorse for incorporating ████████████████

████████████ into its own, contradicting the explicit terms of the Solicitation to credit an offeror

for the capabilities of its partners and subcontractors.  *See* Solicitation, Attachment 7 at 2.  At a

minimum, given ████████████████████████████████████████, which

43

produces units at a rate of ▮▮▮ per day, the scale of the NGDV production program at ▮▮▮▮▮

units per year is well within the scale supported by the proposed quality system.  The USPS

again appears to have disregarded the requirement to credit an offeror for the capabilities of its

partners and subcontractors.

<u>Factor 3: Past Performance</u>

132.    The USPS afforded undue weight to Workhorse's prior experience ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  In this regard, the Solicitation stated that Prototype

Performance was the most important subfactor of the Past Performance evaluation.  The USPS,

however, unreasonably elevated the importance of prior experience.  In its Response Letter, the

USPS devoted three subsections to discussing ▮▮▮▮▮▮▮▮▮▮▮▮ in Workhorse's past

performance.  Response Letter at 19–20.  Conversely, the USPS included just one section

discussing Workhorse's Prototype Performance—the most important subfactor in the Past

Performance evaluation.

<u>Subfactor 3.1: Prototype Performance</u>

133.    The USPS was to evaluate offerors' Prototype Performance "as demonstrated by

the Postal Service's testing and observations during the NGDV Prototype Phase, including

validation of subsystem reliability, vehicle safety, fuel economy, acceptance testing validation,

break-in resistance, cold weather adaptability, and any other relevant performance tests

performed by the Postal Service."  Solicitation, Attachment 7 at 2.

134.    The evidence demonstrates that the USPS failed to meaningfully review

Workhorse's proposal and improperly faulted Workhorse for issues identified during prototype

testing.  The purpose of testing was to identify weak points so that the design could be improved.

As issues became apparent during testing, Workhorse corrected them on all six prototype

44

vehicles.  With all the issues remediated, the prototypes successfully completed the USPS test requirements of 24,000-mile durability testing and the 120 simulated delivery routes without any safety-critical incidents.  Deficiency Response at 72.  The USPS even acknowledges that Workhorse's proposal stated it would remedy all of the issues uncovered during the prototype testing.  Response Letter at 19.

135.    Nevertheless, the USPS claimed that Workhorse's proposal failed to ████████ ████████████████████████████████████████  This is incorrect.  Workhorse submitted to and received approval from the USPS for ██ design revision requests.  DRR 001– 048.  For example, during the debriefing, the USPS cited ██████████████████████████ However, the ██████████████ should not be attributed to Workhorse; instead, they are a result of a failure to follow instructions to plug the vehicle in when parked where it is cold. Indeed, by the end of testing, only five of the identified issues remained unresolved.  *Id.*; Problem Solving A3 Forms.  Four of those five issues have since been resolved and the only outstanding issue is the ██████████████, which Workhorse has redesigned and described in detail on page 30 of Tab E.05.  Deficiency Report at 76.  The SOW requires design modifications to be approved by the USPS during the Production Program; therefore, this item cannot be approved without a contract award.

136.    Moreover, the record shows that the USPS improperly double-counted prototype testing issues, giving these issues undue weight and competitively disadvantaging Workhorse. For example, in its Design Quality evaluation, Workhorse cited the prototype's brake incident and included a photo taken during the testing, indicating that the USPS considered the brake issue in evaluating the Design Quality subfactors when these subfactors should have been limited to Workhorse's proposal, not the truck's performance in prototype testing.

137.    The USPS also insinuated that the extension in testing Workhorse's prototype delayed the NGDV Production RFP rollout.  Response Letter at 19.  This distorts the facts. Workhorse was not the last company to complete testing; thus, it is misleading to state that Workhorse caused the delays when another competitor completed its testing after Workhorse.

138.    Oshkosh did not demonstrate an electric vehicle during prototype testing.  Based on press reports, the selected Oshkosh vehicle will allow the NGDV to be equipped with either an ICE or a battery electric powertrain.  In addition, the selected NGDV as depicted in the press does not even physically resemble the prototype that was tested by the USPS.  In fact, the images of the Oshkosh vehicle on the USPS website announcing the NGDV award further confirm that USPS's evaluation was inadequate.  The passenger side doors of the Oshkosh vehicle on the USPS website have no recess, making it impossible for one door to slide past the other. Accordingly, the USPS failed to demonstrate a reasonable basis for concluding that Oshkosh's NGDV performed well during "performance tests performed by the Postal Service" while assigning weaknesses for Workhorse's vehicle—which remediated any issues and met requirements by the end of testing.

<u>Subfactor 3.2: Prior Performance</u>

139.    The USPS was to assess offerors' Prior Performance based on the "[e]xtent and quality of offeror and key partners/subcontractor(s)['] past performance in both research/development and design/production of vehicles[,]" including performance on prior government and commercial contracts of similar type and scope.  Solicitation, Attachment 7 at 2.

140.    The USPS apparently faulted Workhorse for ███████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████

███████████████████   In fact, Workhorse is the only company with a fully electric last-mile delivery truck on the road in the United States and is the only company in the world that has an electric delivery truck with an integrated aerial drone delivery system.  Moreover, Workhorse's vehicle is the only one with ████████████████████████████████ ███████, allowing for safe driving in a wide range of conditions.

141.   Under the Prior Performance subfactor, the USPS was to consider "offeror[s] and key partners/subcontracts past performance" and look for past performance on "prior Postal Service, government and/or commercial contracts of similar type and magnitude and ability to provide high quality and timely delivery of vehicles . . . ."  Solicitation, Attachment 7 at 2.

142.   The extensive production experience and many decades of success of Workhorse's selected manufacturing partner, █████████████████, was improperly ignored and dismissed.  This directly contradicts the Solicitation's commitment to credit an offeror's "key partners/subcontractor(s)."  As set forth in the proposal, ███████ provides several examples of high-volume manufacturing of complex automotive systems employing large-scale, Tier-One quality assurance.  The Workhorse production plan to be executed by ███████ detailed the assembly process, staffing needs, recruitment strategy and production specifics, and included a complete plan for plant preparation and tooling.

143.   By contrast, according to published reports, Oshkosh has yet to determine where it would assemble its theoretical vehicles, essentially ruling out the possibility that its production and delivery plan employs the level of analysis and specificity presented in the Workhorse proposal.

144.   The USPS also improperly faulted Workhorse because ██████████████████ ████████████████████████████████████████████████████████████

██████████████████████████████████. Response Letter at 20.  As required by the Solicitation, Workhorse's proposal demonstrated its past performance in successfully designing and producing electric last-mile delivery vehicles very similar to the NGDV for blue-chip customers such as ████  Workhorse has approximately ██████████ in purchase orders for such vehicles from ████████████████████████████████████████.  Yet, the USPS discounted Workhorse's ██████████ in purchase orders as "future performance," which ignores the fact that Workhorse is in the first and largest segment of its production of battery electric vehicles ("BEVs") with over ███ electric vehicles already assembled at Union City, Indiana.  Deficiency Report at 84.  Moreover, the USPS faulted Workhorse for building fewer than 1,000 vehicles, which ignores Workhorse's partners who have completed large-scale productions.  For example, ██████████████████ rolling chassis manufacturing operation produces units at a rate of ████ per day, so the scale of the NGDV production program at ████ units per year is well within the scale supported by the proposed quality system.  *See* Technical Proposal, Tab C at 35–36.

145.    Oshkosh, by contrast, has little experience producing commercial on-road vehicles, much less last-mile delivery vehicles like the NGDV.  Nor does it have any demonstrated experience in building electric vehicles or retrofitting vehicles from gas-burning to electric.  Instead, its past performance is limited to producing military vehicles designed for off-road terrain and completing tasks entirely unlike those the NGDV will perform.

### Count II.B: The USPS Failed to Consider NEPA Risks Inherent in Oshkosh's Proposal and Strengths in Workhorse's Zero-Emissions Alternative.

146.    The USPS's NGDV contract decision is subject to review under the National Environmental Policy Act, 42 U.S.C. § 4321, et seq., which "ensure[s] that the federal government gives proper consideration to the environment prior to undertaking any major federal

action that could significantly impact the environment."  Solicitation at 15.  To comply with NEPA, the USPS is required to prepare an Environmental Impact Statement ("EIS") to review and assess the environmental impact of any award made pursuant to the Solicitation.  While such a review will remain independent of the evaluation and contract award, any contracts awarded pursuant to the Solicitation are strictly contingent upon a satisfactory completion of the NEPA and EIS process.  Solicitation at 15.  If the USPS, upon completion of the NEPA review, concludes it must alter any NGDV requirements, USPS may need to modify the quantity, type, or delivery timeline for the NGDVs.  The USPS may also need to terminate the contract award(s) entirely.

147.     The USPS stated that it gave extensive consideration to NEPA in its decision to award the NGDV production contract to Oshkosh's proposal of majority ICE, fossil fuel-powered vehicles.  *See* Response Letter at 7.  The USPS also claimed that Workhorse has demonstrated a "fundamental misunderstanding" of NEPA by pointing to the risks inherent in awarding such a contract under the USPS's own regulations and Solicitation.  *See* Response Letter at 7.  Nowhere in Workhorse's disagreement letter does Workhorse claim that NEPA mandates the selection of an all-electric vehicle such as Workhorse's.  Rather, Workhorse submits that the USPS's contract award to Oshkosh in light of USPS NEPA regulations and the Solicitation's NEPA contingency further reflects the USPS's flawed and irrational decision making.

148.     As one USPS NEPA regulation states, "it is the policy of the Postal Service to . . . [u]se the NEPA process to identify and assess reasonable alternatives to proposed actions in order to avoid or minimize adverse effects on the environment."  39 C.F.R. § 775.2(e).  While NEPA may not mandate the selection of a zero-emissions vehicle, it does mandate that federal

agencies adequately consider the effects of their projects on the environment and thus reflect the environmental goals set forth by Congress.  *See Polayes v. USPS* (*In re Coal. for a Livable Westside)*, 99 Civ. 10873 (AKH), 2000 U.S. Dist. LEXIS 12847, at *15–16 (S.D.N.Y. Sep. 7, 2000) (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 370–71 (1989)).  The USPS's decision to award the NGDV contract to Oshkosh—and to a fleet that Postmaster General DeJoy admitted may only be 10% electric "as a starting point," and will require billions of dollars of additional funding from Congress—does not reflect adequate consideration of the effects on the environment.  *See* Oversight of the U.S. Postal Service: Hearing Before the Comm. on Fin. Servs. and Gen. Gov., 117 Cong. (Mar. 11, 2021) (Testimony of Postmaster Gen. Louis DeJoy).

149.    As the USPS stated, its inclusion of the special NEPA provision in its Solicitation acknowledged the risks inherent in the NEPA EIS process that a contract could be terminated, modified, and/or significantly delayed.  *See* Response Letter at 8; Solicitation at 15.  The Agency, however, failed to demonstrate how Oshkosh's ICE fleet was consistent with the Solicitation's NEPA requirements.  The fact that the USPS chose to award a contract to a majority ICE fleet that is only 10 percent electric will necessarily lead to greater scrutiny under the NEPA EIS process than had the USPS selected Workhorse's 100 percent zero-emissions, fully-electric fleet, which is already primed for production.  Further, the USPS's selection of Oshkosh's proposal that—in order to be environmentally friendly—requires a costly and untested conversion to electric, failed to address how it will overcome the scrutiny it will face under the NEPA EIS process.  When the USPS considers the environmental impacts of Oshkosh's fossil fuel-burning vehicle under the NEPA EIS process, it will be forced to acknowledge that an electric vehicle—

in particular the Workhorse vehicle that the USPS tested and evaluated—meets the procurement's Purpose and Need with substantially fewer environmental impacts.

150.    The USPS further claimed that Workhorse has failed to demonstrate how its fully zero-emissions fleet could take less time to undergo the NEPA/EIS process than Oshkosh's majority fossil fuel-burning fleet.  *See* Response Letter at 8.  However, as stated in Workhorse's proposal, in March 2020, Workhorse C-Series vehicles—which are similarly all-electric and with similar test results to the Workhorse NGDV—received a Certificate of Conformity from the Environmental Protection Agency within three weeks of submission of the application.  *See* Technical Proposal, Tab A at 9.  While Workhorse's electric vehicles have successfully undergone federal agency review, Oshkosh itself admits it will be required to "spend additional funds on product research and development and implementation costs" in order to begin even offering electric vehicles or attempting to convert its ICE fleet to electric.  Oshkosh Corp., 2020 Annual Report (Form 10-K), at 32 (Nov. 18, 2020).

151.    This only compounds the risks of selecting Oshkosh's concept vehicle over Workhorse's proven vehicle, which will be zero-emissions from the outset.  Despite admitting that the "NEPA review process was a significant consideration in all decisions," USPS has failed to explain how a fleet that is only 10 percent electric and has yet to be tested offers the "best value" when the USPS was also presented with a 100 percent electric fleet that completed USPS's rigorous prototype testing.

### Count II.C: The USPS Failed to Calculate Properly the Total Cost of Ownership of Workhorse and Oshkosh's Proposals.

152.    The USPS's calculation of the proposals' Total Cost of Ownership ("TCO") is fundamentally flawed.

153.     When evaluating offerors' TCO, the USPS was supposed to consider proposals'

acquisition cost, maintenance, fuel and charging infrastructure over the 20-year design life.

Solicitation, Attachment 7 at 1.

154.     The USPS claims that, per its evaluation criteria, Oshkosh's ICE vehicle ranked

first with a TCO at ███████████ while Workhorse's BEV ranked second at ███████████. *See*

Response Letter at 10.

155.     However, this ranking does not appear to be grounded in the facts and data

provided in Workhorse's proposal.  Rather, it reflects the USPS's fundamental misunderstanding

and flawed evaluation of the cost savings that would result from an all-electric vehicle over a

conventional ICE vehicle—let alone an ICE vehicle that requires an additional $8 billion from

Congress to even prepare it for conversion to electric.  *See* Letter from Louis DeJoy, Postmaster

Gen., USPS, to Sen. Gary C. Peters, Chairman, Sen. Comm. on Homeland Security and Gov.

Affairs, et al. 2 (Mar. 11, 2021).

156.     As Workhorse set forth in its proposal, if the USPS deployed 165,000 Workhorse

all-electric vehicles, instead of conventional ICE vehicles, the USPS would save at least $354

million per year in fuel and maintenance costs alone and more than $7 billion over twenty years

of the life of the vehicle.  *See* Technical Proposal, Tab A at 7.  In addition, as detailed in

Workhorse's proposal, the Workhorse NGDV has a fraction of the moving vehicle parts and

maintenance needs of an ICE or hybrid platform, greatly reducing maintenance costs while also

being more reliable.  *See id*.  Lower maintenance costs, together with the obvious savings on fuel

costs easily overcome any initial difference in acquisition and charging infrastructure costs.

157.     Further, based on the notice of award and other publicly available information

concerning the award to Oshkosh, and conservative assumptions regarding expected fuel and

maintenance, the TCO calculation for Oshkosh's vehicle cited by the USPS as ███████ appears to be grossly understated.

158.    This material misunderstanding and misevaluation of the cost savings of Workhorse's all-electric NGDV is also evident in a letter from Postmaster General DeJoy, stating that the USPS did not select an electric vehicle because it would require an additional $3 to $4 billion to acquire the necessary charging infrastructure.  *See* Legislative Proposals to Put the Postal Service on Sustainable Financial Footing: Hearing Before the Comm. on House Oversight and Reform, 117 Cong. (Feb. 24, 2021) (Testimony of Postmaster Gen. Louis DeJoy).  Contrary to General DeJoy's testimony, the estimated cost for 165,000 charging stations would be only $990 million.

159.    Additionally, although the USPS publicly credited Oshkosh for the purported convertibility of its non-existent vehicle, it failed to account for the astronomical cost of at least $8 billion, according to DeJoy, that such a conversion would entail and the accompanying impact on the acquisition cost of the vehicles.  *See* Letter from Louis DeJoy, Postmaster Gen., to Gary C. Peters, Chairman, Sen. Comm. on Homeland Security and Gov. Affairs, et al. 2 (Mar. 11, 2021).

160.    Workhorse's vehicle, by contrast, is already electric and production-ready.  There is simply no way that the TCO for the Oshkosh vehicle could compare to Workhorse's TCO if the expense of the retrofit and related infrastructure cost were considered.  Failure to account for that cost as part of the TCO and best value analysis is fundamentally unreasonable, especially in light of the emphasis the USPS has placed on the purported convertibility of the Oshkosh vehicle in its public comments touting the award decision.  Letter from Louis DeJoy, Postmaster Gen.,

USPS, to Sen. Gary C. Peters, Chairman, Sen. Comm. on Homeland Security and Gov. Affairs, et al. 2 (Mar. 11, 2021).

161.    The USPS's fundamental misunderstanding and misevaluation of the TCO of Workhorse's NGDV is also revealed in its discussion of Workhorse's partnership with ████ ████ one of the largest electric power holding companies in the United States.  In a detailed proposal to the USPS attached to Workhorse's technical proposal, ██████████ indicated that it is willing to finance the construction of the charging infrastructure that DeJoy claimed was cost prohibitive.  *See* Technical Proposal at Tab F.  Remarkably, the USPS claims that it was appropriate to exclude the associated cost savings from ██████████ proposal in its TCO calculation for Workhorse because "Workhorse's proposal submission regarding ██████████ was not an RFP requirement" and "Workhorse should not have included proposals for other scopes of work in response to the RFP."  *See* Response Letter at 21.  However, the USPS's own Solicitation states that offerors would be credited for "initiatives identified by the offeror pertaining to emerging vehicle technologies, with a focus on . . . Alternative Fuel Capability" and "innovative sustainability business practices."  *See* Solicitation at 15, 48.

162.    Dismissing Workhorse's innovative ██████████ initiative out of hand was therefore improper, especially given the favorable consideration that the USPS gave to Oshkosh's prototype testing done outside of the scope of the Solicitation and the Prototype Phase and the credit that the USPS gave to Oshkosh's purported convertibility in statements touting the award decision.  *See, e.g.*, Oversight of the U.S. Postal Service: Hearing Before the Comm. on Financial Services and Gen. Gov., 117 Cong. (Mar. 11, 2021) (Testimony of Postmaster Gen. Louis DeJoy).

163.    As alleged above, the USPS overwhelmingly and continuously failed to evaluate Workhorse's and Oshkosh's proposals in accordance with the terms the Solicitation.  Throughout its technical evaluation, the USPS committed countless errors, failing to understand both its own prescribed evaluation criteria and Workhorse's proposal.  Among other deficiencies, the USPS discredited Workhorse's proposal in many respects for failing to provide information that it never, in fact, requested nor required, and, similarly, failed to credit Workhorse's proposal for aspects that, pursuant to the Solicitation, it committed to consider.  *See, e.g.*, *supra* ¶¶ 102–05 (assigning Workhorse a "█████████████" on Technical Evaluation subfactor 1.1, Reliability, because it "failed to include test data" that the Solicitation never requested, and that Workhorse did, in fact, submit in support of its proposal), 119, 122, 126, 131, 141–42 (neglecting to credit Workhorse for its strategic partnerships with industry experts on Supplier Capability subfactors 2.1, 2.2, 2.3, and 2.4 and Past Performance subfactor 3.2).

164.    Likewise, the USPS's Response Letter reveals that it impermissibly considered Workhorse's prototype performance across multiple technical evaluation criteria, when it was only to be considered once, as a subfactor of the least important Technical Evaluation Factor. *See, e.g.*, *supra* ¶¶ 108–09 (considering Workhorse's prototype testing in calculating subfactor Technical Evaluation subfactor 1.1).  The USPS, in effect, elevated the importance of prototype performance in the calculation of its technical evaluation scores.  Its calculation of Workhorse's and Oshkosh's TCO is similarly incongruous with fact, and yet Workhorse's TCO still ranked second among all offerors.

165.    But for the USPS's repeated errors, Workhorse's technical evaluation score would have been much higher and Oshkosh's technical evaluation score would have been much lower, thereby elevating Workhorse's overall technical evaluation performance to meet or exceed that of

the winning offeror.  Likewise, but for USPS's TCO miscalculations, Workhorse's TCO would have been equal to or better than that of Oshkosh's proposed ICE vehicle.  Accordingly, the Agency's best value tradeoff analysis would have resulted in award to Workhorse.

### Count III

### *The USPS's Arbitrary, Capricious, and Unreasonable Evaluation of Workhorse's Proposal Breached an Implied-in-Fact Contract with Workhorse to Consider its Proposal Fairly.*

166.    Workhorse hereby incorporates by reference all preceding paragraphs of this Complaint as though set forth fully herein.

167.    The USPS breached an implied contract with Workhorse to consider fairly and honestly Workhorse's proposal.  *See Safeguard*, 989 F.3d at 1342 ("[T]he plain language of 28 U.S.C. § 1491, the statutory context, and the legislative history demonstrate that Congress intended the Claims Court to have jurisdiction over implied-in-fact contract claims in the procurement bid protest context under 28 U.S.C. § 1491(b)(1).").

168.    The USPS issued its offer by posting the Solicitation, which Workhorse accepted when it submitted its proposal.

169.    As set forth more fully above, Workhorse breached this contract by failing to evaluate Workhorse's proposal fairly, equally, and in accordance with the terms of the Solicitation.

### Bases for Injunctive Relief

170.    Workhorse hereby incorporates by reference all preceding paragraphs of this Complaint as though set forth fully herein.

171.    Any one of the illegal actions discussed above merits sustaining Workhorse's protest.

172.     Workhorse has also satisfied the remaining requirements for permanent injunctive relief.

### Irreparable Harm

173.     Workhorse will be irreparably harmed and have no adequate remedy at law for the USPS's unlawful actions if the award to Oshkosh stands.  Absent a permanent injunction, Workhorse would no longer have the opportunity to compete fairly for the award.

174.     Workhorse also will have no other avenue by which to recoup the potential profits it would have received had it been awarded the NGDV contract.

### Balance of Hardships

175.     The balance of hardships also favors Workhorse.

176.     As to the USPS, any potential harms the Agency may allege were brought about by its own arbitrary, capricious, and unlawful actions and are overcome by its own long-term interest in ensuring that any new contract for the services in question truly represents the best overall value to the United States.

177.     Based on information and belief, Oshkosh has not begun performing the contract.

178.     By contrast, Workhorse has suffered and will continue to suffer irreparable harm if this Court permits the USPS to direct Oshkosh to perform the contract.  Thus, the balance of hardships favors Workhorse.

### Public Interest

179.     Finally, the public interest favors the granting of injunctive relief.

180.     There is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes, regulations, and the terms of their own solicitations.

181.    Second, and as demonstrated by President Biden's recent Executive Order, congressional discourse, and other public attention, the public interest in the USPS's vast fleet, environmental sustainability, and fiscal responsibility favors the granting of injunctive relief. Further, based on information and belief, there will be no disruption of services if this Court grants injunctive relief.

182.    Under these circumstances, it is incumbent upon the Court to issue a permanent injunction to protect the public's interest and to safeguard the integrity of the procurement process.

## Requests for Relief

WHEREFORE, Plaintiff, Workhorse respectfully requests this Court to enter judgment in Plaintiff's favor and to provide the following relief:

1. Entry of judgment in favor of Plaintiff and against the United States;

2. Entry of a declaratory judgment that the award to Oshkosh was unlawful and improper and an injunction directing that the award be terminated;

3. Entry of an injunction directing the USPS to reevaluate the offerors' proposals in accordance with the terms of the Solicitation, applicable laws, and regulations;

4. Entry of an injunction directing the USPS to conduct a new best value determination; and

5. Such other relief as the Court may deem just and proper.

Dated: June 16, 2021

Respectfully submitted,

/s/ Thomas P. McLish
Thomas P. McLish
tmclish@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, D.C. 20006
(202) 887-4000 (Tel)
(202) 887-4288 (Fax)

*Attorney for Workhorse Group Inc.*

Of Counsel:

Scott M. Heimberg
sheimberg@akingump.com
Samantha J. Block
samantha.block@akingump.com
McKenzie F. Miller
mckenzie.miller@akingump.com
Madeline M. Bardi
mbardi@akingump.com