**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**Bid Protest**

| | | |
|---|---|---|
| WORKHORSE GROUP INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-1484C |
| | ) | |
| v. | ) | Judge Zachary N. Somers |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OSHKOSH DEFENSE, LLC, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO MOTIONS TO DISMISS**

# TABLE OF CONTENTS

                                                                                       Page

INTRODUCTION ....................................................................................................................1

QUESTIONS PRESENTED.....................................................................................................3

REGULATORY BACKGROUND ...........................................................................................3

FACTUAL AND PROCEDURAL BACKGROUND ..............................................................4

      A.      USPS's NGDV Program ...........................................................................4

      B.      USPS's Award Decision and Public Comments .....................................6

      C.      Workhorse's Disagreement and USPS's Denial ....................................7

      D.      This Action ...............................................................................................8

ARGUMENT ............................................................................................................................8

      I.       Legal Standard ..........................................................................................8

      II.      The Postal Service's Exhaustion Rule is Ultra Vires ............................9

                     A.      Congress Did Not Authorize USPS to Limit the Court's
                                Jurisdiction under the Tucker Act ...............................................9

                       B.      *Palladian Partners* and the Other Cases on which the Government
                                Relies Did Not Involve Agency Attempts to Unilaterally Restrict
                                this Court's Jurisdiction and are Otherwise Distinguishable ...............12

                       C.      Congress's Bid Protest Statutory Scheme Confirms the Lack of
                                  Congressional Intent for USPS to Restrict This Court's Tucker Act
                                Jurisdiction ................................................................................16

      III.     No Purpose Would Be Served By Requiring Exhaustion In These
             Circumstances .........................................................................................18

                       A.      The Facts Demonstrate That an Appeal to the SDRO Would Have
                                  Been Futile ................................................................................18

                       B.      In the Alternative, the Court Should Defer Ruling on Futility
                                    Pending Receipt of the Full Administrative Record ...................22

                     C.      The USPS Administrative Review Scheme Violates the
                                  Appointments Clause of the Constitution ..................................23

CONCLUSION.......................................................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airport Rd. Assocs., Ltd. v. United States*,
866 F.3d 1346 (Fed. Cir. 2017)..............................................................................8

*Am. K-9 Detection Servs., LLC v. United States*
No. 20-1614, 2021 WL 1086225 (Fed. Cl. Mar. 19, 2021) .....................................11

*Clark v. United States*,
149 Fed. Cl. 409 (2020) ....................................................................................9, 22

*Coit Independence Joint Venture v. Fed. Sav. & Loan Ins. Corp.*,
489 U.S. 561 (1989)..............................................................................................9

*Corus Staal BV v. United States*,
502 F.3d 1370 (Fed. Cir. 2007).................................................................14, 15, 19

*Dynamic Sec. Concepts, Inc. v. F.A.A.*,
408 F. App'x 624 (3d Cir. 2010) ...........................................................................17

*Edmond v. United States*,
520 U.S. 651 (1997)...............................................................................................23

*Emery Worldwide Airlines, Inc. v. United States*,
264 F.3d 1071 (Fed Cir. 2001).......................................................................9, 17, 18, 21

*Fla. Home Med. Supply, Inc. v. United States*,
131 Fed. Cl. 170 (2017) ..................................................................................15, 18

*Harmonia Holdings Grp., LLC v. United States*,
999 F.3d 1397 (Fed. Cir. 2021)......................................................................12, 13

*Hawpe Constr. Inc. v. United States*,
46 Fed. Cl. 571 (2000), *aff'd*, 10 F. App'x 957 (Fed. Cir. 2001) ...........................13

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
238 F.3d 1324 (Fed. Cir. 2001)..............................................................................16

*Itochu Bldg. Prods. v. United States*,
733 F.3d 1140 (Fed. Cir. 2013)......................................................................19, 20

*Kontrick v. Ryan*,
540 U.S. 443 (2004)...............................................................................................9

*Martinez v. United States*,
　333 F.3d 1295 (Fed. Cir. 2003) ........................................................................18

*Multimax, Inc. v. F.A.A.*,
　231 F.3d 882 (D.C. Cir. 2000) ..........................................................................16

*Natural Res. Def. Council, Inc. v. EPA*,
　824 F.2d 1146 (D.C. Cir. 1987) (en banc) ........................................................21

*Neely v. United States*,
　285 F.2d 438 (Ct. Cl. 1961) ..............................................................................15

*Palladian Partners, Inc. v. United States*,
　783 F.3d 1243 (Fed. Cir. 2015) ................................................................ *passim*

*Pension Benefit Guar. Corp. v. Carter & Tillery Enters.*,
　133 F.3d 1183 (9th Cir. 1998) ............................................................................9

*Pixton v. B & B Plastics, Inc.*,
　291 F.3d 1324 (Fed. Cir. 2002) ..........................................................................9

*Pucciariello v. United States*,
　116 Fed. Cl. 390 (2014) ....................................................................................17

*RAI Care Ctrs. of Md. I, LLC v. Office of Pers. Mgmt.*,
　459 F. Supp. 3d 124 (D.D.C. 2020) ..................................................................10

*Rocovich v. United States*,
　933 F.2d 991 (Fed. Cir. 1991) ......................................................................9, 22

*Sandvik Steel Co. v. United States*,
　164 F.3d 596 (Fed. Cir. 1998) ..........................................................................15

*S.K.J. & Assocs., Inc. v. United States*,
　67 Fed. Cl. 218 (2005) ......................................................................................16

*Smith v. Orr*,
　855 F.2d 1544 (Fed. Cir. 1988) ........................................................................15

*Snow v. U.S. Postal Serv.*,
　778 F. Supp. 2d 102 (D. Me. 2011) ..................................................................10

*Sw. Airlines Co. v. United States Dep't of Transp.*,
　832 F.3d 270 (D.C. Cir. 2016) ..........................................................................17

*The Ravens Grp., Inc. v. United States*,
　79 Fed. Cl. 100 (2007) ......................................................................................17

*United States v. Arthrex, Inc.*,
 141 S. Ct. 1970 (2021).................................................................................2, 23, 24

*Weeks Marine, Inc. v. United States*,
 575 F.3d 1352 (Fed. Cir. 2009).................................................................................16

**Statutes & Rules**

13 C.F.R. § 121.1102 .................................................................................12, 13, 14

13 C.F.R. § 121.1003 .................................................................................13

39 C.F.R. pt. 601 .................................................................................3

39 C.F.R. § 601.107 .................................................................................3, 7, 4, 10

39 C.F.R. § 601.108 ................................................................................. *passim*

Fed. R. Civ. P. 12 .................................................................................8, 22

15 U.S.C. § 632 .................................................................................13

15 U.S.C. § 634 .................................................................................13

15 U.S.C. § 637 .................................................................................13

28 U.S.C § 1491 ................................................................................. *passim*

28 U.S.C. § 2637 .................................................................................15

28 U.S.C. § 2675 .................................................................................10

31 U.S.C. §§ 3551–57 .................................................................................11, 16

39 U.S.C. § 401 .................................................................................10, 14

39 U.S.C. § 409 .................................................................................10

39 U.S.C. § 410 .................................................................................11, 17

49 U.S.C. § 40110 .................................................................................11, 16, 17

49 U.S.C. § 46110 .................................................................................17

**Other Authorities**

60 Fed. Reg. 55171 (Oct. 25, 1995).................................................................................16, 17, 18

70 Fed. Reg. 20291 (Apr. 19, 2005) .................................................................................3, 4

72 Fed. Reg. 58251 (Oct. 15, 2007)..................................................................4, 22

75 Fed. Reg. 1541 (Jan. 12, 2010) ...........................................................................4

David P. Hendel, *Bid Protests: Postal Service Style* (Feb. 2, 2011),
    https://www.contractorsperspective.com/bid-protests/bid-protests-postal-
    service-style/ ....................................................................................................11

David P. Hendel, *Feature Comment: New USPS Procurement Rule-Are the
    Guidelines Really Non-Binding?*, 47 No. 27 Gov't Contractor (July 20, 2005) .....................11

*Oversight of the U.S. Postal Service: Hearing Before the H. Appropriations
    Subcomm. on Fin. Svcs. and Gen. Gov't*, 117th Cong. (Mar. 11, 2021)
    (testimony of Postmaster Gen. and CEO Louis DeJoy) ..........................................6

Government Accountability Office, *U.S. Postal Service: Purchasing Changes
    Seem Promising, but Ombudsman Revisions and Continued Oversight Are
    Needed* (Dec. 2005), *available at* https://www.gao.gov/assets/gao-06-190.pdf....................22

USPS Newsroom, Next Generation Delivery Vehicle Production Contract Award
    Announcement (February 23, 2021), https://media.usps.com/events/NGVD/ .........................6

USPS, Supplying Principles and Practices § 7-4.1 (June 2020),
    https://about.usps.com/manuals/spp/html/spp7_021.htm ....................................4, 22

## INTRODUCTION

Defendant The United States and Defendant-Intervenor OshKosh Defense, LLC (the "Movants") argue that this Court may not exercise its jurisdiction under the Tucker Act to consider Plaintiff Workhorse Group's ("Workhorse") challenge to a flawed bidding process and improperly awarded contract for the U.S. Postal Service's ("USPS") Next Generation Delivery Vehicles ("NGDV"). Movants rely on a USPS regulation stating that a supplier must present a bid protest through two levels of administrative appeal before seeking judicial review.

The first problem with Movants' argument is that Congress did not authorize USPS to limit the jurisdiction Congress gave this Court under the Tucker Act to decide bid protests. Because only Congress can limit the Court's Tucker Act jurisdiction, USPS cannot mandate that a supplier like Workhorse exhaust two levels of administrative review before it can seek judicial relief. Indeed, neither Movant cites to a decision holding that USPS's regulation is a valid restriction on this Court's ability to entertain bid protests. The primary decision on which Movants rely, *Palladian Partners, Inc. v. United States*, 783 F.3d 1243 (Fed. Cir. 2015), is readily distinguishable from this case. It addressed a "size protest," which the Federal Circuit has held is distinct from a bid protest, such as Workhorse's here. It involved an exhaustion regulation issued by the Small Business Administration ("SBA") pursuant to a statute to assign standard business size codes, a process particularly within the SBA's expertise. No comparable congressional authorization supports the USPS regulation Movants invoke here. And USPS's regulation does not involve the resolution of any technical issue outside of this Court's expertise, but rather purports to set up a general bid protest process to address issues that Congress gave this Court jurisdiction to decide under the Tucker Act.

Secondly, USPS's attempt to unilaterally give itself its own mandatory bid protest process is inconsistent with Congress's well-established statutory scheme for bid protests. Congress has

established multiple fora to decide bid protests, including this Court and the Government Accountability Office ("GAO"). When Congress sees a need for a separate administrative bid protest process for a particular agency, it establishes one by statute, as it did for the Federal Aviation Administration ("FAA"). There is no statutory support whatsoever for USPS's creation of its own bid protest procedure, much less one that purports to restrict this Court's Tucker Act jurisdiction.

Third, applying the exhaustion regulation would serve no purpose here, where Workhorse presented its claims at the first level of administrative review and USPS made it clear that it would not change its predetermined conclusion to award the contract to OshKosh Defense, LLC ("Oshkosh"). The exhaustion doctrine does not require parties to take obviously useless steps in order to preserve their rights. It would have served no purpose for Workhorse to bang its head against the wall here, especially as the second level of the administrative process provides not an independent and unbiased review, but simply another instance of USPS reviewing its own work and rubber stamping its award decision. This is completely unlike the administrative remedial scheme addressed in *Palladian*, where Congress had established a neutral body inside the SBA to address challenges to technical decisions initially made by contracting officers outside the SBA.

Beyond these fatal flaws in the motions to dismiss, USPS's two-level appeals process also runs afoul of the Constitution's Appointments Clause. Just last month, the Supreme Court held that inferior officers cannot finally adjudicate claims on behalf of the Executive Branch where their decisions are not reviewable by a principal officer who is appointed by the President with the advice and consent of the Senate. *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021). USPS's second-level appeal decision-maker is just such an inferior officer whose decisions are final and binding yet not subject to review by USPS's Board of Governors, the Postmaster General, or any

principal officer.  Because USPS's administrative process is constitutionally infirm, Workhorse was not required to follow it.

Workhorse's bid protest is properly before the Court, and the motions to dismiss should be denied.

## QUESTIONS PRESENTED

1.      Whether USPS had authority to limit this Court's Tucker Act jurisdiction to decide bid protests by mandating exhaustion of administrative remedies prior to judicial review.

2.      Whether any purpose would be served by requiring exhaustion of both levels of administrative appeal where Workhorse presented its arguments at the first level and USPS's decision rejecting them and subsequent actions made clear that it would not change its predetermined conclusion to award the contract to Oshkosh.

3.      Whether USPS's administrative review scheme violates the Appointments Clause because it provides for an inferior officer's adjudicative decision to bind the Executive Branch without being subject to review by a principal officer who is appointed by the President with the advice and consent of the Senate.

## REGULATORY BACKGROUND

In 2005, USPS issued regulations purporting to establish an administrative procedure for supplier bid protests: the supplier disagreement resolution ("SDR") process.  70 Fed. Reg. 20291 (Apr. 19, 2005); 39 C.F.R. pt. 601.  The process encompasses two levels of appeal: initial disagreement resolution and SDR Official ("SDRO") disagreement resolution.  39 C.F.R. §§ 601.107, 601.108. At the first level, the responsible contracting officer considers the supplier's claims in support of its bid protest and issues a written decision.  *Id.* § 601.107(b).  At the second level, the SDRO (called an ombudsman in the original regulations) considers the supplier's claims and issues a written decision.  *Id.* § 601.108(e).  Second-level appeals must be lodged within 10

days of the contracting officer's decision. *Id.* § 601.108(d)(3). The SDRO is a contracting officer appointed by the USPS Vice President for Supply Management. *Id.* § 601.107(a)(5); USPS, Supplying Principles and Practices § 7-4.1 (June 2020), https://about.usps.com/manuals/spp/html/spp7_021.htm. Under the USPS regulations, the SDRO's decision is "final and binding." 39 C.F.R. § 601.108(g).

As originally promulgated, the regulations stated that the second-level decision was not reviewable by a federal court except on the grounds that the decision was "procured by fraud" or "obtained in violation of the regulations…or an applicable public law[.]" 70 Fed. Reg. at 20298; 39 C.F.R. § 601.108(h)(5) (2006). In 2007, USPS amended the regulations to add criminal misconduct as another basis for judicial review. 72 Fed. Reg. 58251, 58254 (Oct. 15, 2007); 39 C.F.R. § 601.108(g) (2008). In 2010, USPS again amended the regulations to state that a party may seek judicial review of a USPS contract award "only after the mandatory administrative remedies provided under § 601.107 and § 601.108 have been exhausted," describing the amendment in the preamble as intended "to clarify" certain of the SDR procedures. 75 Fed. Reg. 1541, 1541–42 (Jan. 12, 2010); 39 C.F.R. § 601.108(h).

## FACTUAL AND PROCEDURAL BACKGROUND

### A. USPS's NGDV Program

USPS operates a fleet of over 200,000 delivery vehicles in the United States and its territories. Compl. ¶ 17, ECF No. 1. With the vast majority of those vehicles approaching the end of their life cycles and USPS in need of a new, modern fleet, USPS developed the NGDV Program. *Id.* USPS touted the NGDV program as forward-thinking, encouraging offerors to adopt innovative and sustainable technologies such as alternative fuel systems and autonomous capabilities. *Id.*

4

USPS began the prototype phase of the procurement in October 2015, issuing a solicitation for the design, development, and manufacture of NGDV prototypes. *Id.* ¶ 19. In September 2016, Workhorse's former partner, VT Hackney, Inc., was one of six prototype suppliers selected for award of a prototype contract. *Id.* Workhorse purchased the VT Hackney prototype and assumed VT Hackney's responsibilities under the solicitation. *Id.* ¶ 19 n.2. Oshkosh was another of the six prototype suppliers selected. *Id.* The selected suppliers designed and manufactured NGDV prototypes for USPS, which conducted testing of emissions and fuel economy, ergonomics, aesthetics, handling, and durability. *Id.* ¶ 20.

At great financial cost to it, Workhorse submitted a fully electric delivery vehicle, which it designed and constructed entirely from scratch specifically to meet or exceed USPS's requirements and purposes. *Id.* ¶ 21. Consistent with the purpose of the Prototype Phase, Workhorse studied USPS testing results and revised its design accordingly to resolve any shortcomings USPS identified to Workhorse. *Id.* ¶ 22. In contrast, Oshkosh submitted a Ford Transit-based vehicle, i.e., an already-existing commercial vehicle with a Ford Transit chassis and customized body. *Id.* ¶ 21.

On December 27, 2019, USPS issued a solicitation for award of an IDIQ Fixed Price with Economic Price Adjustment contract for a minimum of 50,000 and maximum of 165,000 vehicles. *Id.* ¶¶ 24–25. In the solicitation, USPS proposed to make awards to the offeror(s) whose proposal offered USPS the best value, which it would determine by weighing factors such as total cost of ownership, technical evaluation results, and risk. *Id.* ¶ 27. Workhorse timely submitted a proposal on July 14, 2020. *Id.* ¶ 52. USPS on several occasions held discussions with Workhorse in which it raised some deficiencies it had identified in Workhorse's proposal. *Id.* ¶¶ 62–65. On each occasion, USPS gave a brief description of the purported deficiency and did not identify to

Workhorse any as major or critical; USPS also did not ask follow-up questions of Workhorse or identify additional deficiencies to it after receiving Workhorse's responses. *Id.*

**B. USPS's Award Decision and Public Comments**

On February 23, 2021, Workhorse received a notice of award from the contracting officer stating that USPS had made the contract award to Oshkosh with an initial $482 million payment for Oshkosh to finalize its production design. *Id.* ¶ 66. That same day, Postmaster General Louis DeJoy expressed satisfaction with the award in a video announcement on the USPS website, stating, "I am happy I could move the ball across the goal line with this project and I am excited to celebrate this win today." USPS Newsroom, *Next Generation Delivery Vehicle Production Contract Award Announcement* (February 23, 2021), https://media.usps.com/events/NGVD/.

The award to Oshkosh came shortly after President Biden's Executive Order of January 27, 2021, directing the procurement of "clean and zero-emission vehicles for Federal, State, local, and Tribal government fleets, including vehicles of the United States Postal Service." Compl. ¶ 68. Yet, the selected Oshkosh vehicle is a conventional internal combustion engine vehicle, like the rest of the aging USPS fleet. *Id.* ¶ 67. Remarkably, Oshkosh's vehicle also is entirely different from the Ford Transit-based vehicle that it submitted in the Prototype Phase. *Id.* While Oshkosh claims its vehicle can be retrofitted to be electric, Oshkosh admitted to the Securities and Exchange Commission in November 2020 that Oshkosh may not have the expertise or resources to successfully manufacture electric vehicles on a cost-effective basis, or at all. *Id.* Further, in congressional testimony in February 2021, Postmaster General DeJoy stated that only 10 percent of the new Oshkosh fleet eventually would be electric unless USPS receives an additional $3–4 billion in funding. *Id.* ¶ 71. During a March 2021 congressional hearing, DeJoy stated that if USPS were to receive additional funding from Congress, the Oshkosh fleet could "maybe" become 50 percent electric. *Oversight of the U.S. Postal Service: Hearing Before the H. Appropriations*

6

*Subcomm. on Fin. Svcs. and Gen. Gov't*, 117th Cong. (Mar. 11, 2021) (testimony of Postmaster Gen. and CEO Louis DeJoy).

Workhorse timely requested a debriefing on the award decision. Compl. ¶ 74. At the debriefing, held on March 3, 2021, USPS described certain strengths and weaknesses it had identified in Workhorse's proposal but refused to provide any information regarding the comparative strengths and weaknesses of Oshkosh's proposal. *Id.*

### C. Workhorse's Disagreement and USPS's Denial

On March 12, 2021, Workhorse submitted a "disagreement" to USPS pursuant to 39 C.F.R. § 601.107, triggering a 10-day resolution period in which USPS was required to attempt to resolve the conflict "by mutual agreement." Compl. ¶ 75. In its disagreement, Workhorse requested that USPS withdraw the award to Oshkosh and make a new award decision based on a rational best-value analysis in accordance with the express terms of the Solicitation. *Id.* USPS did not make any contact with Workhorse, much less any effort to come to a mutually agreeable resolution, during that 10-day period. *Id.* ¶ 76.

At the end of the so-called resolution period, on March 22, 2021, the contracting officer denied Workhorse's disagreement in a 25-page letter (Exhibit 1 hereto). The letter made clear that USPS had predetermined that Workhorse would not be granted any relief during the administrative process and, indeed, that in USPS's view W███████████████████████████████████ █████████. After stating that Oshkosh's versions of the NGDV were "█████████████," USPS asserted that "██████████████████████████████████████████████████ █████████████████████████████" Ex. 1 at 1. USPS further stated that "██████████ ████████████████████████████████████████████████████" *Id.* at 5. It went on to claim that Workhorse's technical proposal was "███████████████" and "████████ ██████████████████████████" *Id.* USPS admits, however, ████████████████████

7

██████████████████████████████████████████████████████████

███████████████████████████████. *Id.* at 5.

In sharp contrast, USPS's response letter uncritically touted Oshkosh's claims about its unbuilt hypothetical vehicle and rejected out of hand any criticisms of Oshkosh or its vehicle. For example, Workhorse had referred in its disagreement letter to publicly available disclosures that Oshkosh, in violation of the terms of the Solicitation, had lobbied USPS, the White House, the House of Representatives, and the USPS Board of Governors during the Solicitation process in support of its desire to be selected for the NGDV contract. Without any support, USPS's response letter declared these assertions "unequivocally false" and illustrative of Workhorse's "lack of credibility and candor with the Federal Government." *Id.* at 1 n.1. Yet it is, in fact, true that Oshkosh wrongly engaged in lobbying activities during the Solicitation process.[1]

**D. This Action**

On June 16, 2021, Workhorse filed this action. On July 6, 2021, the government and Defendant-Intervenor Oshkosh moved to dismiss. Gov. Mot. to Dismiss, ECF No. 29 ("Gov. Mot."); Def.-Int. Mot. to Dismiss, ECF No. 31 ("Intervenor Mot.").

## ARGUMENT

**I. Legal Standard**

Because Movants argue that under USPS regulations the Court lacks jurisdiction over Workhorse's bid protest, Federal Rule of Civil Procedure 12(b)(1) supplies the relevant legal standard. Under Rule 12(b)(1), the Court "view[s] the alleged facts in the complaint as true, and if the facts reveal any reasonable basis upon which the non-movant may prevail, dismissal is

---

[1] See, e.g., https://lda.senate.gov/filings/public/filing/bc3bc7be-b5b7-48e5-81d6-ebcb37ec5d15/print/.

inappropriate." *Airport Rd. Assocs., Ltd. v. United States*, 866 F.3d 1346, 1351 (Fed. Cir. 2017) (quoting *Pixton v. B & B Plastics, Inc.*, 291 F.3d 1324, 1326 (Fed. Cir. 2002)). The Court also "may 'inquire into jurisdictional facts' to determine whether it has jurisdiction," and consider matters outside of the pleadings. *Clark v. United States*, 149 Fed. Cl. 409, 412 (2020) (quoting *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)).

## II. The Postal Service's Exhaustion Rule is Ultra Vires

### A. Congress Did Not Authorize USPS to Limit the Court's Jurisdiction under the Tucker Act

Congress expressly granted the Court of Federal Claims jurisdiction to hear bid protests—including bid protests involving USPS—through the Tucker Act. 28 U.S.C. § 1491(b)(1) (giving Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement"); *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1083–84 (Fed Cir. 2001). The USPS regulation impermissibly purports to limit that jurisdiction by barring bid protests of USPS-awarded contracts in this Court if the protestor has not first participated in USPS's own internal bid protest process. USPS lacks authority to restrict the jurisdiction conferred by Congress.

"Only Congress may determine a lower federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004) (citing U.S. Const., art. III, § 1). Accordingly, an agency cannot preempt the Court's jurisdiction through a regulation without congressional authorization. *Coit Independence Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561, 579 (1989) (Federal Savings and Loan Insurance Corporation exceeded its statutory authority in passing a regulation restricting federal courts' review of the Corporation's decisions by making them reviewable only under the Administrative Procedure Act); *Pension Benefit Guar. Corp. v.*

*Carter & Tillery Enters.*, 133 F.3d 1183, 1187 (9th Cir. 1998) (holding that exhaustion requirement created by regulation did not create a jurisdictional bar); *RAI Care Ctrs. of Md. I, LLC v. Office of Pers. Mgmt.*, 459 F. Supp. 3d 124, 133 (D.D.C. 2020) ("exhaustion regulations are just that—regulations—rather than statutes passed by Congress," and therefore not jurisdictional).

The USPS regulation on which the Movants rely, 39 C.F.R. § 601.108(h), asserts that a party "may seek review of the Postal Service's final contract award only after the mandatory administrative remedies provided under § 601.107 and § 601.108 have been exhausted." It also purports to limit the protest grounds that this Court can consider: only those that allege a "violation of the regulations contained in this part or an applicable public law enacted by Congress." *Id.* This regulation is invalid insofar as it purports to preempt the Court's jurisdiction under the Tucker Act by mandating exhaustion of two levels of agency review before a bid protest may be brought before the Court. The government argues that the Postal Reform Act at 39 U.S.C. § 401(2) authorizes the preemption, Gov. Mot. at 4, 11, but nothing in that general authorization of rulemaking authority suggests that Congress intended for USPS to restrict the Court's Tucker Act jurisdiction. 39 U.S.C. § 401(2) (giving USPS "general powers" including "to adopt, amend, and repeal such rules and regulations, not inconsistent with this title, as may be necessary in the execution of its functions under this title and such other functions as may be assigned to the Postal Service under any provisions of law outside of this title"). By contrast, where Congress intended for USPS to implement a mandatory administrative remedies scheme, the Postal Reform Act specifies it. *Id.* § 409(c) (incorporating Federal Tort Claims Act ("FTCA") and its mandatory administrative remedy scheme); *Snow v. U.S. Postal Serv.*, 778 F. Supp. 2d 102, 108 (D. Me. 2011) (FTCA's mandatory exhaustion requirement, 28 U.S.C. § 2675, applies to claims against USPS). Congress did not address administrative remedies for bid protests in the Postal Reform Act.

10

Rather, it addressed these in the Tucker Act, and there assigned jurisdiction to this Court. 28 U.S.C § 1491(b). *See also* 31 U.S.C. §§ 3551–57 (assigning bid protest jurisdiction to GAO); 49 U.S.C. § 40110(d)(4) (assigning bid protest jurisdiction to the FAA Office of Dispute Resolution ("ODRA")).[2]

That the Postal Reform Act exempts USPS from much of the Administrative Procedure Act and its notice-and-comment protections, 39 U.S.C. § 410(a), reinforces the conclusion that Congress did not authorize USPS to restrict the Court's exercise of Tucker Act jurisdiction. Congress could not have intended for USPS to use that exemption—designed to facilitate procurement, see *id.*, Gov. Mot. at 8—to take action as extreme as restricting access to judicial review without any opportunity for comment from those affected. Yet USPS has done just that by amending 39 C.F.R. § 601.108 to mandate exhaustion without providing any notice or opportunity for comment.

The government cites no authority to support its assertion that USPS can create an exemption from this Court's jurisdiction under the Tucker Act without any indication from Congress of such authority; nor does the defendant-intervenor. And with good reason. As discussed, only Congress has the power to restrict the Court's jurisdiction.[3]

---

[2] When 39 C.F.R. § 601.108 was first promulgated, at least one commentator opined that the regulation's provisions restricting judicial review were unenforceable. David P. Hendel, *Feature Comment: New USPS Procurement Rule-Are the Guidelines Really Non-Binding?*, 47 No. 27 Gov't Contractor ¶ 313 (July 20, 2005). When the regulation was amended in 2010, the same commentator, a former attorney in USPS's Office of the General Counsel, called the updated restrictions "utter nonsense" and "unenforceable" because this Court, not USPS, decides its jurisdiction. David P. Hendel, *Bid Protests: Postal Service Style* (Feb. 2, 2011), https://www.contractorsperspective.com/bid-protests/bid-protests-postal-service-style/.

[3] As far as undersigned counsel has been able to determine, neither this Court nor the Federal Circuit has addressed the validity of 39 C.F.R. § 601.108(h)'s purported limitation of Tucker Act jurisdiction. In *Am. K-9 Detection Servs., LLC v. United States*, the government argued, similarly to its argument here, that § 601.108(h) should create an exemption from Tucker Act jurisdiction. No. 20-1614, 2021 WL 1086225, at *10 n.2 (Fed. Cl. Mar. 19, 2021) (Holte, J.). The

11

**B.** ***Palladian Partners* and the Other Cases on which the Government Relies Did Not Involve Agency Attempts to Unilaterally Restrict this Court's Jurisdiction and are Otherwise Distinguishable**

*Palladian Partners v. United States*, on which Movants principally rely, is unlike this case in key respects. First, that case involved a small business size protest, not a bid protest. Second, the regulatory exhaustion requirement at issue in *Palladian Partners* did not concern bid protests or purport to limit Tucker Act jurisdiction, as USPS's regulation does. Third, the exhaustion regulation at issue in that case was consistent with Congress's statutory scheme, whereas USPS's is not. Fourth, an exhaustion requirement made sense in that case because the administrative process at issue involved the application of unique agency expertise, which is not the case here.

The exhaustion regulation at issue in *Palladian Partners* involves challenges to the SBA's selection of business size standard codes for small businesses (North American Industry Classification System ("NAICS") codes). It requires challenges to a code selection for a particular solicitation to be appealed to the SBA's Office of Hearing and Appeals ("OHA") before judicial review. *Palladian Partners*, 783 F.3d at 1247 (discussing 13 C.F.R. § 121.1102). The regulation thus concerns judicial review of SBA's business sizing code selections—determinations within the SBA's particular expertise—not bid protests such as the USPS regulation addresses. *See* 13 C.F.R. § 121.1102 ("A NAICS code designation made by a procuring activity contracting officer may be appealed to OHA . . . The OHA appeal is an administrative remedy that must be exhausted before judicial review of a NAICS code designation may be sought in a court.").

The Federal Circuit has drawn a clear distinction between "size protests," such as the one involved in *Palladian Partners*, and "bid protests," such as Workhorse's here. *Harmonia Holdings*

---

Court did not decide the question, but it noted the government did not cite case law in support of the exemption argument. *Id.*

*Grp., LLC v. United States*, 999 F.3d 1397 (Fed. Cir. 2021). In *Harmonia Holdings,* the Federal Circuit, citing *Palladian Partners*, "agree[d] that a disappointed bidder must generally exhaust its administrative remedies at the SBA before seeking judicial review of a size protest." *Id*. at 1402. The court explained that "[a] 'size protest' refers to an administrative challenge to an offeror's size which is filed with the SBA." *Id.* at 1403 (citing 13 C.F.R. §§ 121.1003, 121.1002). The court noted that "[a] 'bid protest,' by contrast, generally challenges actions that an agency takes, or fails to take, in connection with a procurement or proposed procurement." *Id.* at 1403 (citing 28 U.S.C. § 1491(b)(1)). Because the protest in *Harmonia Holdings* was a bid protest and not a size protest, the Federal Circuit rejected the Court of Federal Claims' conclusion that it lacked jurisdiction because the protestor had failed to exhaust its administrative remedies at the SBA. *Id.* at 1403–404. This Court has recognized the same distinction. *Hawpe Constr. Inc. v. United States,* 46 Fed. Cl. 571, 576–77 (2000), *aff'd*, 10 F. App'x 957 (Fed. Cir. 2001) (where protest has not challenged a size determination, but rather the actions of the procuring agency, "Plaintiff's cause of action arises under the contracts and bid protest jurisdiction of the Tucker Act [citation omitted], which does not require exhaustion of administrative remedies for post-award bid protests.")

Because *Palladian Partners* involved a size protest, its holding's implications are limited to size protests. Nothing in the decision indicates that the court analyzed the issue of exhaustion within the distinct category of bid protests or that the court intended its holding to extend beyond the realm of size protests. Even if it did, it would be *dicta*. In short, *Palladian Partners* does not control here, as Workhorse's protest is a bid protest, for which there is no exhaustion requirement.

Further, in *Palladian Partners,* the parties did not dispute SBA's statutory authority to issue the exhaustion regulation. Rather, the court recognized that Congress, through the Small Business Act, specifically authorized the SBA to establish small business size standards. *Palladian*

*Partners*, 783 F.3d at 1247 (citing 15 U.S.C. §§ 632(a), 637(b)(6)).  That Act also establishes the OHA and authorizes it "to impartially decide matters relating to program decisions of the Administrator . . . that the Administrator designates for hearing by regulation."  15 U.S.C. § 634(i)(1)(A)(i)(II).  SBA's business sizing code determinations are such program decisions.  13 C.F.R. § 121.1102.

The general delegation of rulemaking authority to USPS in 39 U.S.C. § 401(2) is hardly comparable, as it does not establish a particular program or authorize USPS to decide bid protests. Nothing in the Postal Reform Act or any other statute indicates that Congress authorized USPS to establish a bid protest procedure.  Moreover, the administrative process USPS did attempt to create is a general bid protest process that requires no special USPS expertise that this Court does not have.  To the contrary, the bid protest issues that would be resolved under USPS's process are the same that this Court routinely decides.  The USPS bid protest process is simply a duplicative one that places an unnecessary administrative hurdle between a protestor and its right under the Tucker Act to protest in this Court.

The other Federal Circuit cases the government characterizes as consistent with *Palladian Partners* (Gov. Mot. at 12–13) also do not support its claim that USPS can limit this Court's jurisdiction simply by declaring so in a regulation.  In *Corus Staal BV v. United States*, the Federal Circuit addressed whether the administrative remedies established by regulation concerning antidumping must be exhausted before relief is sought in the Court of International Trade ("CIT"). 502 F.3d 1370 (Fed. Cir. 2007).  The Federal Circuit found that the CIT was not bound by the regulation even though the regulation purported to require exhaustion as a prerequisite to judicial review, because no statute or statutory scheme governed.  *Id.* at 1381 ("Where the issue of exhaustion of administrative remedies is not governed by a particular statutory provision or an

overall statutory scheme, the decision whether to require exhaustion in a particular case is a matter committed to the discretion of the trial court; in particular, we have held that applying exhaustion principles in trade cases is subject to the discretion of the judge of the Court of International Trade.") (citing cases). And in its opinion affirming the CIT's dismissal on grounds of failure to exhaust, the Federal Circuit recognized that Congress had instructed the CIT to require exhaustion where appropriate. *Id.* at 1379 (citing 28 U.S.C. § 2637(d)); *see also id.* ("Although that statutory injunction is not absolute, it indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."). Likewise in *Sandvik Steel Co. v. United States*, exhaustion was deemed appropriate in the exercise of the CIT's discretion and consistent with Congress's intent. 164 F.3d 596, 599–600 (Fed. Cir. 1998). Here, there is no such statutory authority supporting USPS's regulation purporting to make exhaustion mandatory.

Whether a mandatory exhaustion requirement was established by a regulation also was not at issue in *Neely v. United States*; the issue there was whether a third party's appeal to the agency on behalf of the plaintiff was sufficient to exhaust an administrative remedy. 285 F.2d 438, 443 (Ct. Cl. 1961) (finding administrative remedy exhausted through U.S. senator's appeal to Secretary of Interior on plaintiff's behalf).[4] Nor was the question of whether a regulatory exhaustion requirement was mandatory presented in *Fla. Home Med. Supply, Inc. v. United States*; there, the Court found that the subject administrative remedial scheme was "permissive, not mandatory."

---

[4] Accordingly, the sentence from *Neely* on which the government relies—"[u]nless made a prerequisite to suit by statute, binding regulation or contract, the extent to which a plaintiff is required to pursue his administrative remedy is a matter for the discretion of the court," 285 F.2d at 433—is obiter dictum and not binding authority. *Smith v. Orr*, 855 F.2d 1544, 1550 (Fed. Cir. 1988) ("[I]t is well established that a general expression in an opinion, which expression is not essential to the disposition of the case, does not control a judgment in a subsequent proceeding.").

131 Fed. Cl. 170, 181 (2017). In so doing, the Court observed that Congress "made no express mention of an administrative remedy" in the governing statute authorizing the regulation, *id.* at 180, and the "statute . . . provides 'no expression of explicit intent from Congress,'" *id.* at 181 (citation omitted).

Likewise here, the Postal Reform Act does not mention administrative remedies for bid protests or evidence any congressional intent for an administrative remedial scheme, let alone a mandatory one that would supersede Congress's grant of jurisdiction to this Court through the Tucker Act.

### C. Congress's Bid Protest Statutory Scheme Confirms the Lack of Congressional Intent for USPS to Restrict This Court's Tucker Act Jurisdiction

There is zero evidence that Congress's statutory scheme for bid protests includes a mandatory administrative process for protests of USPS contracts. To the contrary, Congress has established three separate fora for bid protests. The first is this Court, which has been the exclusive judicial forum for all pre- and post-award bid protests since 2001. 28 U.S.C. § 1491(b); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The second is the GAO, which entertains protests of government procurement decisions pursuant to 31 U.S.C. §§ 3551–57. The third forum is the FAA ODRA, which Congress gave exclusive jurisdiction to address bid protests in connection with FAA procurements. *See Multimax, Inc. v. F.A.A.*, 231 F.3d 882, 884 n.1 (D.C. Cir. 2000). Each of these fora has specific statutory authorization to entertain protests of government procurement decisions. 28 U.S.C. § 1491(b) (COFC); 31 U.S.C. §§ 3551–57 (GAO); 49 U.S.C. § 40110(d)(4) (ODRA). In addition, since 1995 agencies have been required to establish an "agency protest" option, where the protest is directed to the procuring agency itself, "as an alternative to protests in fora outside the procuring agencies." Exec. Order No. 12979, 60 Fed. Reg. 55171, 55171 (Oct. 25, 1995).

16

The availability of the GAO and "agency protest" options has never been held to affect this Court's jurisdiction to entertain a bid protest. A protestor may bypass the GAO and file its protest directly in this Court. *S.K.J. & Assocs., Inc. v. United States*, 67 Fed. Cl. 218, 223–24 (2005); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). If a protestor unsuccessfully protests at the GAO, it may then protest to this Court. *The Ravens Grp., Inc. v. United States*, 79 Fed. Cl. 100, 115 (2007). Likewise, a protestor need not pursue an agency protest at all before filing its protest in this Court, and whether or not an agency protest was filed has no bearing on this Court's jurisdiction to entertain the matter. *See* Exec. Order No. 12979 (agency protests are "an alternative" to protests in other fora). In the case of protests of FAA procurement decisions, in contrast, Congress made ODRA the exclusive process for such protests and provided that judicial review of ODRA decisions would be via an APA action in a federal circuit court. *Sw. Airlines Co. v. United States Dep't of Transp.*, 832 F.3d 270, 275–76 (D.C. Cir. 2016); *Pucciariello v. United States*, 116 Fed. Cl. 390, 410 (2014).

Against this backdrop, USPS attempted unilaterally to create, by regulation, a new bid protest process that prospective USPS contractors must follow in order to invoke this Court's Tucker Act bid protest jurisdiction. The USPS is not subject to the GAO bid protest process because Congress exempted it from the Competition in Contracting Act, under which GAO exercises its bid protest function. 39 U.S.C. § 410(a); *Emery Worldwide Airlines, Inc.*, 264 F.3d at 1079 n.7. USPS is not subject to ODRA. *Dynamic Sec. Concepts, Inc. v. F.A.A.*, 408 F. App'x 624, 628 n.3 (3d Cir. 2010) (citing 49 U.S.C. §§ 40110(d) and 46110) (ODRA has bid protest jurisdiction over FAA procurements). But Congress has never exempted USPS from this Court's bid protest jurisdiction under the Tucker Act. *See Emery Worldwide*, 264 F.3d at 1083–84. Unlike with ODRA, Congress did not direct USPS to establish its own bid protest forum. Indeed,

Congress has never given any indication that USPS is authorized to create its own bid protest procedure, much less one that restricts this Court's ability to exercise its congressionally created bid protest jurisdiction.

In short, not only is there a complete lack of evidence that Congress intended for USPS to establish its own bid protest process that must be exhausted before this Court may exercise its Tucker Act jurisdiction, USPS's establishment of such a process runs counter to the statutory scheme that Congress has established for the resolution of bid protests. Because 39 C.F.R. § 601.108, and particularly § 601.108(h), has no statutory authorization, it is ultra vires and invalid.

It is also inconsistent with the requirement in Executive Order No. 12979 that agencies establish "alternative" (i.e., non-mandatory) agency protest procedures. While the term "agencies" is not defined in Executive Order No. 12979, there is no indication that it was meant to exclude USPS. In *Emery Worldwide*, the Federal Circuit determined that USPS is an "agency" for purposes of this Court's bid protest jurisdiction under the Tucker Act. 264 F.3d at 1083–84.

Accordingly, 39 C.F.R. § 601.108 provides no basis for dismissing Workhorse's bid protest for lack of jurisdiction under the Tucker Act, and the motions to dismiss should be denied.

**III.    No Purpose Would Be Served By Requiring Exhaustion In These Circumstances**

   **A.  The Facts Demonstrate That an Appeal to the SDRO Would Have Been Futile**

Because USPS lacked authority to mandate exhaustion, insofar as its two-level administrative review scheme has any legitimacy, its two levels of administrative review are, if valid at all, permissive. "It is well-settled that 'in Tucker Act suits, a plaintiff is not required to exhaust a permissive administrative remedy before bringing suit.'" *Fla. Home Med. Supply, Inc*, 131 Fed. Cl. at 181 (quoting *Martinez v. United States*, 333 F.3d 1295, 1304 (Fed. Cir. 2003)). The motions to dismiss, accordingly, should be denied for this reason also.

18

Even if the Court were to conclude that the exhaustion requirement of 39 C.F.R.
§ 601.108(h) is valid (which it should not, for the reasons discussed), the Court should exercise its
discretion and not apply it to preclude Workhorse's claims before this Court. While pursuit of
administrative remedies can protect administrative agency authority and promote judicial
efficiency, where no purpose would be served by requiring exhaustion and exhaustion would
instead amount to a futile exercise, a court properly exercises its discretion to excuse it. *Itochu
Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013) (excusing exhaustion where
"no purpose was served" by requiring it); *Corus Staal BV*, 502 F.3d at 1379 ("The futility exception
to the exhaustion requirement has been applied in situations in which enforcing the exhaustion
requirement would mean that parties would be required to go through obviously useless motions
in order to preserve their rights.") (internal quotation marks and citation omitted). Here, no
purpose would be served by requiring exhaustion, because in this case it would have plainly been
futile for Workhorse to pursue the second level of USPS administrative review.

The Federal Circuit recognized in *Itochu Bldg. Prods.* that where the plaintiff had presented
its arguments to the agency through one level of an agency review process and the agency rejected
them, and where "no purpose was served" by requiring the plaintiff to resubmit its arguments at a
second level of agency review, exhaustion of the second level of administrative remedies was not
required. 733 F.3d at 1146. The plaintiff had asked the Department of Commerce to revoke part
of an antidumping-duty order by a certain date and submitted comments and arguments in support
of its request. *Id.* at 1142. Commerce issued a preliminary ruling rejecting the request but giving
interested parties an opportunity to comment prior to the agency's final ruling. *Id.* The plaintiff
did not submit additional comments and instead sought judicial review of the final ruling in the
CIT. *Id.* at 1144. The Federal Circuit reversed the CIT's dismissal for failure to exhaust

19

administrative remedies, finding that "no purpose was served by requiring [exhaustion]" because: (1) the plaintiff had presented its arguments to the agency at the first level of agency review; (2) nothing in the record suggested that additional materials from the plaintiff would have been significant to the agency's consideration or to judicial review; and (3) nothing in the agency's rejection of the plaintiff's petition "adverted to any consideration that was material to Commerce's decision about the effective date and that [the plaintiff] had failed to address." *Id.* at 1146. The agency's stated basis for its decision and its adherence to that position in court "strongly suggest[ed] that a [second administrative petition] by [the plaintiff] would have been futile." *Id.* The Federal Circuit explained that "[i]n these circumstances, there was no reasonable prospect that Commerce would have changed its position" at the second level of agency review, and "there was no practical purpose served by requiring [the plaintiff] to file comments on the effective-date issue after Commerce released its preliminary results." *Id.* at 1147.

Likewise here, there was no reasonable prospect that USPS would have changed its position at the next level of administrative review and no practical purpose would be served by requiring Workhorse to undertake that futile action. USPS's decision rejecting Workhorse's disagreement clearly and emphatically stated USPS's final position on Workhorse's claims. Given the size and importance of this procurement, it being high profile, the Postmaster General's involvement in announcing the contract award, and his defense of that decision in subsequent sworn congressional testimony making it clear that USPS had decided Oshkosh would perform the contract, the notion that the SDRO might have reached a different result and granted Workhorse the relief it seeks is fanciful. USPS's decision "strongly suggests" that the second step would have been futile, as "there was no reasonable prospect that [USPS] would have changed its position" on Workhorse's bid protest. *Itochu*, 733 F.3d at 1146–47. Consequently, there would be "no practical

20

purpose served" by requiring Workhorse to go through USPS's second level of review after USPS issued its March 22, 2021 decision. *Id.* at 1147. To the contrary, the expense of doing so would have been a waste of Workhorse's resources. Moreover, the comprehensive administrative record and lengthy decision from USPS's first level of review provide a full record for the Court's review.

By contrast, in *Palladian Partners*, the plaintiff failed to submit *any* petition to the agency, thereby "depriv[ing] the agency of an opportunity to correct its own errors." *Palladian Partners*, 783 F.3d at 1261 (citation omitted). Indeed, the Federal Circuit recognized there that "courts have waived exhaustion where the agency 'has had an opportunity to consider the identical issues . . . raised by other parties,' or if the agency's decision indicates that it 'had the opportunity to consider the very argument pressed by the petitioner on judicial review.'" *Id*. at 1260 (quoting *Natural Res. Def. Council, Inc. v. EPA*, 824 F.2d 1146, 1151 (D.C. Cir. 1987) (en banc) (cleaned up)).

Contrary to Movants' contentions, review of a bid protest does not implicate USPS's unique expertise. USPS has discretion in procurement decisions, but the expertise in resolving legal challenges to bid protests under the Tucker Act resides in this Court and the Federal Circuit. *Emery*, 264 F.3d at 1083 (recognizing "the substantial experience and expertise the Court of Federal Claims has developed in the government contracting area") (citation omitted). By contrast, *Palladian Partners*, where the Court declined to excuse exhaustion, implicated the SBA's unique expertise in NAICS code assignment. *Palladian Partners*, 783 F.3d at 1260 (explaining that "NAICS code selection is a fact-specific determination that requires agency expertise"). In addition, there was "no evidence that Palladian's now urged code designation was discussed during [another party's] OHA appeal." *Id.* at 1261. Here, Workhorse presented its bid protest to USPS, USPS issued a decision emphatically rejecting it, and the Postmaster General made it clear that Oshkosh would perform the contract. *See supra* 7–8.

Further, USPS's second-level appeal official to whom Movants insist Workhorse should have presented its claims—the SDRO—is not a neutral decision-maker. The GAO in 2005 criticized USPS for assigning binding decisionmaking authority over supplier disputes to an ombudsman who was appointed by the USPS Vice President for Supply Management and held a position and responsibilities in the USPS Supply Management organization and, therefore, was "not independent of, or impartial from, the Supply Management organization." GAO, *U.S. Postal Service: Purchasing Changes Seem Promising, but Ombudsman Revisions and Continued Oversight Are Needed* 37–38 (Dec. 2005), *available at* https://www.gao.gov/assets/gao-06-190.pdf. In 2007, USPS changed the name from ombudsman to SDRO, 72 Fed. Reg. at 58251, but did nothing to remedy the lack of independence and impartiality identified by the GAO. Just like the ombudsman, the SDRO is appointed by the USPS Vice President for Supply Management. USPS, Supplying Principles and Practices § 7-4.1 (June 2020), https://about.usps.com/manuals/spp/html/spp7_021.htm.

### B. In the Alternative, the Court Should Defer Ruling on Futility Pending Receipt of the Full Administrative Record

To the extent the Court concludes that the current record is not sufficient to establish futility, it should withhold its ruling on jurisdiction until it has been able to review the full administrative record. *See Clark*, 149 Fed. Cl. at 412 (recognizing that on a Rule 12(b)(1) motion, the Court "may 'inquire into jurisdictional facts' to determine whether it has jurisdiction" and consider matters outside of the pleadings) (quoting *Rocovich*, 933 F.2d at 993). Review of the full record will demonstrate that for Workhorse to pursue further administrative review would have served no purpose, especially given the statements by USPS and the Postmaster General about Oshkosh handling the high profile, large NGDV contract.

### C. The USPS Administrative Review Scheme Violates the Appointments Clause of the Constitution

The Appointments Clause of the United States Constitution precludes binding administrative adjudications that are not reviewable by a principal officer who is appointed by the President and confirmed by the Senate. *Arthrex*, 141 S. Ct. at 1986. Yet that is precisely what USPS's regulations purport to do. The regulations provide that the SDRO decision at the second level of administrative review is final and binding, and do not provide for any review by a principal officer.

In *Arthrex*, the Supreme Court considered the constitutionality of the authority of administrative patent judges within the Patent Trial and Appeal Board ("PTAB") to adjudicate certain patentability claims and issue decisions where the decisions were not reviewable by the Secretary of Commerce or any other principal officer. Under the Appointments Clause, only the President, with the advice and consent of the Senate, can appoint principal officers who assist the President in carrying out his responsibilities and are accountable to him. *Arthrex*, 141 S. Ct. at 1980. Inferior officers, who are not appointed by the President and confirmed by the Senate, must be "directed and supervised at some level" by principal officers so that they are ultimately accountable through a chain of command to the President. *Id.* (quoting *Edmond v. United States*, 520 U.S. 651, 663 (1997)). Adequate supervision entails ability to review inferior officers' work. *Id.* at 1983 (citing cases). Administrative patent judges' patentability decisions—which could implicate billions of dollars, *id.* at 1976—were final, but they were not reviewable by, and thus were "insulat[ed]" from, the Secretary of Commerce, the Director of the PTAB (also a principal officer), and any other principal officer. *Id.* at 1985. Consequently, the Supreme Court held, administrative patent judges' authority was "incompatible" with their appointment as inferior officers and a violation of the Appointments Clause. *Id.*

23

Similarly here, the SDRO is not a principal officer, yet under USPS regulations issues "final and binding" decisions on which billions of dollars can turn.[5] 39 C.F.R. § 601.108(g).  As previously set forth, the SDRO is appointed by the USPS Vice President for Supply Management, and USPS regulations do not provide that SDRO decisions are reviewable by the presidentially appointed USPS Board of Governors or even the Postmaster General.  Instead, SDRO decisions are insulated from review by any principal officer.  Consequently, as in *Arthrex*, the SDRO's authority under 39 C.F.R. § 601.108 is "incompatible" with their appointment as an inferior officer and violates the Appointments Clause.  *Arthrex*, 141 S. Ct. at 1986.

Because the USPS administrative remedies scheme that incorporates unreviewable final decisions by the SDRO is constitutionally infirm, the Court should give the scheme no effect.  But if the Court determines that Workhorse should present its claims to the SDRO for decision, it should remand this matter to USPS for the SDRO to consider its bid protest and for the USPS Board of Governors or Postmaster General to have the ability to review the SDRO's decision.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's and the intervenor's motions to dismiss.

Dated: July 20, 2021        Respectfully submitted,

/s/ Thomas P. McLish
Thomas P. McLish
tmclish@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, D.C. 20006
(202) 887-4000 (Tel)
(202) 887-4288 (Fax)
Attorney for Workhorse Group Inc.

---

[5] The NGDV contract at issue here is valued at $3.1 billion.  Intervenor. Mot. at 4.

Of Counsel:

Scott M. Heimberg sheimberg@akingump.com
Caroline Wolverton cwolverton@akingump.com
Samantha J. Block samantha.block@akingump.com
McKenzie F. Miller mckenzie.miller@akingump.com
Madeline M. Bardi mbardi@akingump.com

Michael F. Mason mike.mason@hoganlovells.com
Catherine E. Stetson cate.stetson@hoganlovells.com
Susan M. Cook susan.cook@hoganlovells.com
Stacy M. Hadeka stacy.hadeka@hoganlovells.com

# EXHIBIT 1

SUPPLY MANAGEMENT



March 22, 2021

**VIA EMAIL (tmclish@akingump.com)**

Thomas P. McLish, Esq.
Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, DC 20006

Re:    Workhorse Group, Inc.'s Business Disagreement of March 12, 2021
       USPS Solicitation No. 3D-20-A-0031

Dear Mr. McLish:

Your correspondence of March 12, 2021, on behalf of your client Workhorse Group, Inc. ("Workhorse"), presents a business disagreement ("Disagreement"), as defined in 39 C.F.R. Part 601, with respect to the contract award issued under Solicitation No. 3D-20-A-0031 (the "Solicitation"). The Solicitation was for the supply of Next Generation Delivery Vehicles ("NGDVs") to the United States Postal Service ("USPS" or "Postal Service"). This letter constitutes the Contracting Officer's resolution of Workhorse's Disagreement in accordance with 39 C.F.R. § 601.107(b).

On February 23, 2021, the Postal Service awarded Oshkosh Defense, LLC ("Oshkosh") the NGDV Production contract, No. 3DVPRT-21-B-0002 (the "Contract"). Oshkosh and its parent company have decades of experience designing and manufacturing custom-built vehicles, both for commercial customers and for the United States Government. Oshkosh offered the Postal Service two Production proposals: one proposal for an internal combustion engine ("ICE") vehicle and one proposal for a battery electric vehicle ("BEV"). Oshkosh's proposed ICE and BEV vehicles had the highest technical scores, and its ICE vehicle was evaluated as having the lowest Total Cost of Ownership ("TCO"). By awarding Oshkosh a contract to provide the Postal Service with both BEV and ICE powertrains, we ensured that the USPS could expeditiously update its aging delivery fleet with a NGDV that could meet all of the Postal Service's efficiency, safety, and ergonomic requirements, while at the same time help achieve our sustainability goals in the most cost-effective manner. ███████ ████████████████████ ████████
███████

Workhorse's Disagreement, however, asserts that the decision was plainly wrong and that the Postal Service should have instead awarded the entire NGDV Production contract to Workhorse, ████████



---

[1] Workhorse's Disagreement states: "Workhorse is also troubled by the publicly-available evidence that Oshkosh, through an outside lobbying firm, lobbied USPS, the White House, the House of Representatives and the USPS Board of Governors regarding the NGDV program during the competitive phase of the procurement, despite USPS's requirement that offerors agree not to do so." USPS's irrational decision-making, as described herein, naturally suggests that the lobbying succeeded in improperly influencing USPS's award decision." Disagreement, p. 4. These allegations are unequivocally false, and the fact that you cannot cite to any of the purported "publicly-available evidence" provides another illustration of Workhorse's lack of credibility and candor with the Federal Government. In fact, publicly available information indicates that Workhorse has attempted, and continues to attempt, to improperly influence the NGDV procurement through third-party contacts prohibited by its Nondisclosure Agreement with the USPS. *See* Section III, *infra*; *see also Farrar v. Workhorse Group, Inc.,* Case No. 2:21-cv-02072 (C.D. Cal. Mar. 8, 2021).

[2] *See* Section II(A), *infra*.

**CONFIDENTIAL AND PROPRIETARY USPS INFORMATION**
**SUBJECT TO NGDV PRODUCTION PROGRAM NDA**

Therefore, and as further discussed herein, Workhorse's Disagreement is denied.

## I. BACKGROUND

### A. History of the Postal Service's NGDV Program

The NGDV competitive procurement process began in January 2015, when the Postal Service published a Request for Information ("RFI") and Prequalification/Sources Sought notice.[3] In March 2015, 34 companies submitted prequalification information in response to the RFI. After evaluating the RFI submissions, the Postal Service narrowed the prequalified list to 15 suppliers.[4] The list of prequalified suppliers included both major manufacturers and small businesses, representing a broad range of capabilities and technological solutions.

In October 2015, the Postal Service issued a Request for Proposals ("RFP") for Prototype NGDVs.[5] The RFP included a Statement of Objectives that communicated the Postal Service's operational needs and design objectives. Suppliers were encouraged to offer a wide range of drivetrain technologies – including internal combustion engine vehicles and alternative fuel vehicles – as well as other innovative features. Prototype proposals were due in February 2016. Most of the prequalified suppliers participated in the Prototype RFP, either as a prime offeror or by teaming up with another prequalified supplier.

In September 2016, the Postal Service awarded contracts to six suppliers to produce prototype vehicles for the NGDV program: AM General, LLC; Oshkosh HD, LLC; Spartan Motors (t/a Utilimaster); Mahindra North American Technical Center; Karsan; and VT Hackney, Inc.[6] Prototype delivery began in September 2017. Between September 2017 and May 2019, the Postal Service tested a total of 44 prototype vehicles, which included gasoline, hybrid electric, and electric (with range extender) drivetrains. The Postal Service ran the NGDV Prototypes through a broad range of safety, efficiency, and durability tests. The Prototypes were tested on a vehicle test-track, in simulated delivery conditions, as well as out in the field on actual delivery routes. The testing took place in a variety of different climates, topography, population centers, and delivery environments.

Following the completion of the testing, the Postal Service prepared the NGDV Production RFP, incorporating into the Production vehicle requirements the lessons learned during the Prototype testing.[7] The Production RFP included specific requirements related to the Postal Service's commitment to domestic production and environmental quality. The Production RFP gave suppliers the option to provide proposals for ICE vehicles and/or alternative fuel vehicles.[8] The RFP also contemplated that multiple contracts could be awarded for an ICE vehicle and an alternative fuel vehicle in the event the Postal Service could not obtain both from one supplier.[9] Prior to issuing, the Postal Service also provided Prototype suppliers with the opportunity to review the RFP's draft Statement of Work and provide feedback.

---

[3] See "Request for Information and Prequalification/Sources Sought - Next Generation Delivery Vehicle (NGDV) Acquisition Program" (Jan. 20, 2015), at https://beta.sam.gov/opp/e4c65069740a6b4df5158fb0a9512b1c/view.

[4] See "Next Generation Delivery Vehicle (NGDV) Acquisition Program – Prequalified Sources" (April 14, 2015).

[5] See "Next Generation Delivery Vehicle (NGDV) Prototype Request for Proposal (RFP)" (Oct. 20, 2015), at https://beta.sam.gov/opp/ed2c20e5021355df61636d68b2c5074f/view.

[6] See "Next Generation Delivery Vehicles (NGDV) - Prototypes" (Sep. 16, 2016), at https://beta.sam.gov/opp/07495c8ab09756e6ba25d36a86f0e48b/view. Utilimaster withdrew from the NGDV program in 2017 before producing any prototype vehicles. AM General and Mahindra withdrew from the NGDV program prior to receipt of NGDV Production proposals.

[7] See NGDV Production RFP Statement of Work, Section A, Part 2.2.

[8] See id. at Section D. No Prototype supplier objected to the Postal Service's consideration of both ICE and alternative fuel vehicles at any point prior to the NGDV Production Contract Award.

[9] See NGDV Production RFP, PS Form 8203, Schedule of Supplies/Services; Terms and Conditions, Provision 4-1(f): Type of Contract.

On December 27, 2019, the Postal Service issued the NGDV Production RFP, with a submission deadline of March 27, 2020.[10]  Due to the COVID-19 pandemic, the Postal Service extended the submission deadline to July 14, 2020.[11]  Following submission of Production proposals, the USPS Technical Evaluation Team (TET) began performing their technical review. The TET consisted of subject matter experts from across the organization - Engineering, Delivery Operations, Fleet Management, Safety, and Sustainability. In addition, the evaluation team included engineering consultants as non-voting members. Following initial review, the Postal Service provided offerors with a list of certain questions/deficiencies regarding their proposals, which required offerors to provide updated proposals by September 25, 2020. The TET then reviewed the responses to questions/deficiencies and the updated proposals. Offerors were provided the opportunity to conduct lengthy oral presentations for the USPS evaluation team on October 7-8, 2020. The TET concluded its technical proposal review shortly thereafter.

The Business Proposal evaluation team, which included members from Supply Management, Engineering, and Fleet Management, and outside non-voting consultants, began its review of offeror business proposals in October 2020. Offerors were provided the opportunity to respond to business proposal clarification questions. After conclusion of the Business Proposal evaluation, the Contracting Officer made a best value determination, with Oshkosh ▇▇▇▇▇▇▇ providing the best value to the Postal Service for the NGDV Production contract.  After obtaining final approval from the Postmaster General on February 23, 2021, the Postal Service awarded the NGDV Production contract to Oshkosh.[12]  Please note that at no point prior to the Contracting Officer's best value determination in favor of Oshkosh was either the Postmaster General or the USPS Board of Governors aware of the results of the evaluations of any of the proposals, in communication with the evaluation team, or otherwise involved in the best value determination.

### B.  The NGDV Production Request for Proposals – Best Value & Evaluation Factors

In the Production RFP, the Postal Service advised offerors that it would award the NGDV contract to the offeror(s) whose proposal presented the best value, using the following standard:[13]

> Best value offer(s) will be determined after the completion of the evaluation phase by weighing total cost of ownership, technical evaluation results, and risk. The Postal Service will determine total cost of ownership by considering the following factors: Acquisition costs, Maintenance costs, Fuel costs and Charging Infrastructure costs. ***Proposal and offeror-specific technical evaluation factors, when combined, are considered to be more important than total cost of ownership in consideration of best value selection(s)***. This may result in an award to a higher-rated, higher-priced offeror where the decision is consistent with the evaluation factors, and it is reasonably determined by the Contracting Officer that the technical superiority of the higher priced proposal outweighs the price difference. However, the Postal Service will not make an award at a significantly higher price to achieve slightly superior performance. The right to award to other than the lowest proposed price or total cost of ownership is reserved.[14]

(emphasis added). Technical proposals would be evaluated using three (3) factors in descending order of importance:

- Factor 1: Design Quality and Technical Approach;
- Factor 2: Supplier Capability; and

---

[10] *See* "Next Generation Delivery Vehicle (NGDV) Production Phase 3 Request for Proposal (RFP)" (Dec. 27, 2019), at https://beta.sam.gov/opp/439efaf2ff57436da8403145d0d93069/view.

[11] *See* https://beta.sam.gov/opp/439efaf2ff57436da8403145d0d93069/view.

[12] *See* "Next Generation Delivery Vehicle (NGDV)" (Feb. 23, 2021), at https://beta.sam.gov/opp/1e56c386808444d886124fc1927f4eb0/view.

[13] *See* NGDV Production RFP, Provision 4-2(a); Attachment #7, NGDV Production Proposal Evaluation Criteria, p.1.

[14] *See* NGDV Production RFP, Attachment #7, NGDV Production Proposal Evaluation Criteria, p.1.

**CONFIDENTIAL AND PROPRIETARY USPS INFORMATION**
**SUBJECT TO NGDV PRODUCTION PROGRAM NDA**

- Factor 3: Past Performance.[15]

Within Factor 1, the Postal Service evaluated the following: 1) Reliability, 2) Maintainability, 3) Fuel Economy and Emissions, and 4) Safety and Ergonomics.[16] Within Factor 2, the Postal Service evaluated the following: 1) Engineering Capability, 2) Production and Delivery, 3) Service and Parts, and 4) Quality.[17] Within Factor 3, the Postal Service evaluated the following: 1) Prototype Performance and 2) Prior Performance.[18] Following the receipt of offerors' proposals in July 2020, the evaluation team proceeded to evaluate all proposals under these parameters.

## C. Selection of the Oshkosh Vehicle

As more fully set forth in Sections II(B) and II(E) of this response letter, the evaluation team recommended, and the Contracting Officer determined, that the ICE and BEV vehicles proposed by Oshkosh provided the best value to the Postal Service. The Oshkosh vehicles both received the highest technical scores, and its ICE vehicle has the lowest TCO. It's strategic partner, Ford, has been in the business of manufacturing quality vehicles even longer than Oshkosh. In addition, as expected of all offerors, Oshkosh incorporated much of what it learned from the Prototype phase into a better design for the Production phase. Oshkosh detailed numerous tests of its proposed Production vehicle in its proposal. Testing included body and component durability testing, prototype vehicle durability testing and fuel economy and emissions testing on "test mule" vehicles at third party test facilities. The test reports submitted with the proposal included details of the tests, test procedures and test data produced. The TET determined that the Oshkosh tests followed the same procedures as the prototype test program. Oshkosh furnished an abundance of testing data that demonstrated the quality and reliability of the vehicle's performance.[19]  As the offeror that ▇▇▇▇ presented the best value from both a technical and cost perspective, as the Contracting Officer, I awarded Oshkosh one contract to furnish either ICE and/or BEV vehicles, at whatever mix the Postal Service selected.[20]

## D. The History of Workhorse's Participation in the NGDV Program

Workhorse did not participate in the Prototype phase as a prime contractor, but rather acted as a subcontractor to VT Hackney, who had submitted a Prototype vehicle with ▇▇▇▇▇▇▇▇▇▇▇▇



---

[15] *See id.*

[16] *See id.*

[17] *See id.* at p.2.

[18] *See id.*

[19] While Workhorse argues that Oshkosh's higher NRE of $482M - the dollar value of the first delivery order placed under the Contract - necessarily means that Oshkosh's vehicle is less developed, that is simply not the case. As discussed further in Section II(A), *supra*, Oshkosh's NRE reflects an agreed sum that takes into account several factors, including, most importantly, the NEPA contingency.

[20] The Oshkosh ICE and BEV vehicles have a 92% commonality of parts between them. Among other reasons, a single award to Oshkosh for both vehicles is advantageous because it will result in a significant reduction in maintenance and training costs over the 20-year expected life of the vehicles. Those reductions would not be achieved if USPS awarded two separate contracts to two different companies for two entirely different vehicles.

**CONFIDENTIAL AND PROPRIETARY USPS INFORMATION**
**SUBJECT TO NGDV PRODUCTION PROGRAM NDA**

Following VT Hackney's withdrawal, Workhorse attempted to obtain a strategic partner with the requisite experience to compete in the NGDV Production Program as follows:

- 

- 

As discussed further in Section II(D), herein, the TET's evaluation determined that Workhorse's proposal was ██████████████████████████ . █████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████ as the RFP stated:

> The Postal Service may evaluate offers and award a contract without discussions with offerors. Therefore, the offeror's initial offer should contain the offeror's best terms from a price and technical standpoint. Discussions may be conducted if the Postal Service determines they are necessary.[21]

█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████ Following the Contract award to Oshkosh, Workhorse requested, and the Postal Service provided, a detailed debriefing session to discuss the strengths and weaknesses of Workhorse's technical proposal and help it improve future proposal submissions to the Postal Service.

As the foregoing demonstrates, the Postal Service went to extraordinary lengths to permit Workhorse's predecessor, VT Hackney, to finish Prototype testing, and then to help Workhorse submit a viable proposal.  In light of that course of dealing, Workhorse's assertion that t███████████████████████
██████████████████████████████████ Despite our extensive efforts to support Workhorse, the Workhorse technical proposal was determined to be █████████████ █████████████████. As discussed further in Section II(D), █████████████████████████████████████ and its proposal scoring was properly assessed.

## II.  DISCUSSION

### A.  Workhorse's Disagreement ████████████████████████ ████████████

Much of Workhorse's Disagreement is premised on the faulty assumptions that (1) the Postal Service was required to select an electric vehicle, and (2) Workhorse was the only electric option. However, because the Postal Service disclosed throughout the Prototype and Production programs, including in the RFP,

---

[21] NGDV Production RFP, Terms and Conditions, Provision 4-1(g): Contract Award.

that it was asking for and evaluating both ICE and alternative fuel vehicles, Workhorse knew all along that the Postal Service could award a contract for only some - or no - BEV vehicles. Since Workhorse did not raise its challenge by the time offers were due (*i.e.*, by July 14, 2020), Workhorse waived its right to raise this challenge now. Postal Service regulations make clear that, "[f]or disagreements that concern alleged improprieties in a solicitation, the contracting officer must receive the disagreement before the time set for the receipt of proposals . . . ."[22] However, even assuming that Workhorse's challenge had been timely received, because Workhorse's entire Disagreement is premised on an erroneous interpretation of the Postal Service's sustainability obligations and objectives, I will address these first in responding to Workhorse's Disagreement.

1. **While Executive Order ("E.O.") 14008 does not constrain the NGDV award decision, the award is consistent with the E.O.'s stated goals.**



First, in the Disagreement, you ███████████████ ████████ ████████ ██████████████ ████████ █████ ████████ In reality, section 205 of the E.O. directs three executive agencies - the Council on Environmental Quality ("CEQ"), General Services Administration ("GSA"), and Office of Management and Budget ("OMB") - to "assist the National Climate Advisor in developing a comprehensive plan to create good jobs and stimulate clean energy industries by revitalizing the Federal Government's sustainability efforts." The E.O. requires that the agencies' plan "use, as appropriate and consistent with applicable law, all available procurement authorities to achieve or facilitate . . . (ii) clean and zero-emission vehicles for Federal, State, local, and Tribal governmental fleets, including vehicles of the United States Postal Service." It did not mandate that such procurements occur immediately, nor did it require that all agencies procure only electric vehicles. In other words, the E.O. directed three other federal agencies (not the Postal Service) to begin planning for a future zero-emission governmental fleet. Moreover, the President was aware of the fact that the Postal Service was getting ready to announce the NGDV award when the E.O. was issued, and so the E.O. intentionally did not attempt to disrupt that process.[25]

Irrespective of the foregoing points, whether or not the E.O. has any effect on the NGDV procurement, the Postal Service's procurement strategy and objectives directly align with the goals expressed in the order. The Postal Service supports the deployment of electric technology in our delivery fleet, which is why it awarded a single, flexible contract to Oshkosh which allows for the purchase of both ICE and BEV vehicles. The ultimate extent of our ability to purchase electric vehicles will depend on Congressional financial support, which we are seeking and which the Executive Order contemplates.

2. **Workhorse also** ██████████████████████████████

Next, Workhorse claims that ██████████████████████████████████ ████████████ ██████████████████████████████████████████████████████████[26] This characterization of the Postal Service's plan to electrify its fleet is both (1) plainly wrong; and (2) has been waived. First, on March 11, prior to your Disagreement letter, the Postmaster General confirmed to Congress that 10% NGDV electrification is a starting point, and that *as many as 50% of the NGDVs could*

---

[22] *See* 39 CFR 601.107(b); *see also* **Error! Main Document Only.**, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

[23] *See* Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad" (Jan. 27, 2021).

[24] *See* Disagreement, p. 1-2.

[25] Furthermore, the Postal Service is not typically bound by such executive orders. With the passage of the Postal Reorganization Act of 1970 ("PRA"), the United States Postal Service was established as an independent establishment of the executive branch. The PRA's central purpose was to end postal inefficiency by freeing postal services from direct control by the Legislative and Executive Branches, and to allow the Postal Service to operate like a business, "with powers equivalent to a private business enterprise." Of most importance here, the PRA broadly exempts the Postal Service from federal laws "dealing with public or federal contracts, property, works, officers, employees, budgets, or funds." 39 U.S.C. § 410(a). Instead, the PRA authorizes the Postal Service to determine its need for equipment and the character of and need for its expenditures, to enter into contracts, and to acquire real and personal property as it deems necessary or convenient in the transaction of its business without direct control by the Legislative and Executive Branches.

[26] *See* Disagreement, p.2.

*be electric.*[27] As the Postmaster General made clear, the percentage of ICE and BEV vehicles acquired will be dependent upon funding from Congress (in line with President Biden's Executive Order), which is currently underway. Second, throughout this procurement, the Postal Service has always stated in the RFP that it could award 100% ICE if it determined that such a vehicle presented the best value to the Postal Service.[28] Thus, any challenge to the planned mix of vehicles should have been raised as a pre-award disagreement, and has thus been waived.[29]

### 3. The National Environmental Policy Act (NEPA) was considered extensively in the award decision.

Workhorse also erroneously alleges that ████████████████████████████████████████
████████████████████ In its attempt to support this assertion, Workhorse demonstrates a fundamental misunderstanding of the Postal Service's NEPA process and misrepresents Federal Government data on the point. In reality, as the foregoing demonstrates, the NEPA review process was a significant consideration in all decisions the Postal Service made throughout the procurement process, from drafting the RFP to the final award decision.



### a. Workhorse's Disagreement ████████████████████████████████.

Workhorse's Disagreement argues that ████████████████ ████████████████████████
████████████████ ████████████████████████████████ These arguments, however, reflect a fundamental misunderstanding of NEPA and the process that the Postal Service will follow in order to comply with NEPA. At 42 U.S.C. § 4332(2)(C), NEPA directs "all agencies of the Federal Government [to] include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between the local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitment of resources which would be involved in the proposed action should it be implemented."

There is also no "NEPA approval" which Workhorse can claim to receive in an expedited manner, nor is the NEPA process for the above "detailed statement" one that must be "survived" by the Postal Service's proposed action.[31] As the Supreme Court has repeatedly noted, "NEPA itself does not mandate particular results . . . NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions."[32] Thus, even assuming that Workhorse's bid is "technically and economically feasible" and has a less significant impact on the environment than the Postal Service's proposed action, there is no requirement under NEPA that the Postal Service give Workhorse any sort of preference.

In accordance with the plain text of NEPA and federal case law, the Postal Service's NEPA policy, at 39 C.F.R. § 775.2(e), "to avoid or minimize adverse effects on the environment" is not a mandate to choose the alternative with the least adverse effect on the environment. Thus, even assuming *arguendo* that an electric vehicle like Workhorse's proposal was determined to be such an alternative at the conclusion of the Environmental Impact Statement process, Workhorse's argument that any other selection by the Postal Service would be inconsistent with NEPA demonstrates its misunderstanding of this federal law. In fact, Workhorse cannot guarantee that, were it selected, the NEPA process would not be subject to the same risks of delay or legal challenges that it alleges exist for the proposed action.

---

[27] *See* https://www.c-span.org/video/?509634-1/us-postal-service-oversight-hearing&live= (March 11., 2021).

[28] *See* NGDV Production RFP Statement of Work, Section D.

[29] *See* 39 CFR 601.107(b).

[30] *See* Disagreement, p.3.

[31] *Id.*

[32] *Dep't of Transportation v. Public Citizen*, 541 U.S. 752, 756-57 (2004).

**CONFIDENTIAL AND PROPRIETARY USPS INFORMATION**
**SUBJECT TO NGDV PRODUCTION PROGRAM NDA**

**b. Workhorse's Disagreement appears to misrepresent Federal Government NEPA statistics.**

Workhorse supports its erroneous interpretation of the NEPA process by also stating that ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Since you provide no citation in support, the Postal Service can only assume that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮[34] If that is the case, Workhorse's statement that t▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ is a blatant misrepresentation of the data, which includes far lengthier evaluations such as highway construction and airports - and are highly contentious and require eminent domain.[35] Workhorse also failed to note that its average time cited is for a period of time prior to CEQ's reform of NEPA regulations designed specifically to expedite NEPA reviews. Finally, Workhorse further fails to explain how, if it were the awardee, the Postal Service's EIS would necessarily take less time.

**c. The RFP included special provisions acknowledging the risks inherent in the NEPA Process and its Commitment to Sustainability.**

**i. The Special NEPA Provision and Milestone Payment Schedule were included in the RFP and Contract in recognition of the risks inherent in NEPA for any offeror, irrespective of drivetrain type.**

As NEPA is a pre-decisional statute, the RFP notified offerors that the NGDV award would be contingent on the Postal Service's satisfactory completion of the Environmental Impact Statement. Special Provision: The National Environmental Policy Act (NEPA), subpart (e), in the RFP's Terms & Conditions stated: "The Postal Service's obligation to order the minimum quantity identified in [the RFP] is expressly contingent upon the satisfactory completion of the NEPA EIS process. Any resulting contract(s) awarded pursuant to this solicitation shall reflect this contingency." Thus, any NGDV award – whether the current awardee or an alternative – retains the risk that costs expended to protect the interests of the Postal Service in advance of the Record of Decision may be lost should the Postal Service modify, mitigate, change, or terminate altogether its proposed action. Recognizing that the awardee would not be willing to enter into a contract for production of NGDVs subject to the NEPA clause without some assurance of recovering its start-up costs, the RFP allowed offerors to separately propose non-recurring engineering ("NRE") costs.[36]

**ii. The Emerging Technology Roadmap required all offerors to demonstrate a path to alternative fuel technology.**

In addition to Clause 7-10: Sustainability (July 2014), the Postal Service included another special provision that required that each offeror submit an emerging technologies roadmap along with its proposal.[37] As part of the roadmap, each offeror, whether incorporating an ICE powertrain or an alternative fuel powertrain within their NGDV design, must also demonstrate and document its capability to provide for and design a realistic path towards alternative fuel usage options for the NGDV vehicle.[38] This Roadmap would then become a binding contract document if the awardee's vehicle did not already have an alternative fuel vehicle solution ready for production.[39] Fortunately, Oshkosh's provision of a BEV proposal in addition to its ICE proposal, with both vehicles receiving the highest technical score for their respective drivetrain categories, negated any concerns regarding the need for a roadmap to alternative fuel vehicles at a later date.

---

[33] Disagreement, p.3.

[34] Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act," 85 FR 43304, 43305 (July 16, 2020).

[35] *See id.*

[36] *See* NGDV Production RFP, Attachment #5 - Proposal Data Request Workbook, Section 2 – Milestones.

[37] *See* NGDV Production RFP, Terms & Conditions, Special Provision: Emerging Technologies Roadmap.

[38] *See id.* at (a)(1).

[39] *See id.* at (b).

### iii. The Postal Service placed significant weight on the environmental impact of all proposed NGDVs during the technical evaluation.

In further demonstration of its commitment to environmental considerations, the Postal Service evaluated all offerors' Fuel Economy and Emissions in Factor 1: Design and Technical Approach. Specifically, the Postal Service evaluated:

> *The completeness of description and projected value of offeror's features that focus on improving fuel economy and reducing emissions. Sufficiency of data and analysis from simulation or lab results to support fuel economy and emission performance estimates over the target service life of the vehicle.[40]*

In further demonstration of the importance of environmental impact in the technical evaluation process, the TET included a representative from the Postal Service's Sustainability office as a voting-member. BEV NGDVs, such as those proposed by Workhorse, received higher scores than ICE proposals in Subfactor 1.3, which as part of Factor 1 was weighted more than most other Subfactors, giving BEV proposals a technical scoring advantage over ICE proposals.[41] However, as discussed further in Section II(D), Workhorse was not able to capitalize on this technical scoring advantage.

### 4. Even if the Postal Service was required to buy only BEV, ███████████████

████████████████████████████████████

Contrary to Workhorse's misleading statements to investors and the media suggesting that Workhorse was the only BEV offeror in contention for the NGDV Production contract, the Postal Service received two other BEV offers. ████████████████████████████████████████████████████████

████████████████████████████[42] Notwithstanding Workhorse's speculative assertions about the vehicles proposed by other offerors, Workhorse's Disagreement fails to acknowledge that, even if Oshkosh were eliminated from the competition, and even if the RFP were re-written to exclude ICE vehicles, ██████████████████████████████[43] Therefore, even if Oshkosh was eliminated from the competition, *and* if it was feasible for the Postal Service to acquire only BEVs (which it is not), *and* if the Postal Service was required to only purchase BEV vehicles (which it is not), ████████████████████████ ████████████████ █ ████████████

### B. The Postal Service's Best Value Determination Was Rational and Correct.

Workhorse next argues that ████████████████████████████████████████
████████████████████ To the contrary, the Postal Service performed a lengthy, methodical and well-reasoned evaluation of all submissions. Following the TET's thorough evaluation using the technical factors identified in the RFP, each technical proposal received a numerical score, and overall technical rank, as follows:

| Supplier Name | Numerical Score | Technical Rank |
|---|---|---|
| Oshkosh (ICE) | ████ | 1 |
| Oshkosh (BEV) | ████ | 2 |
| ████████████ | ████ | █ |
| ████████████ | ████ | █ |
| Workhorse (BEV) | ████ | 5 |

---

[40] *See* NGDV Production RFP, Attachment #7 – Production Proposal Evaluation Criteria, p.1.

[41] *See id.*

[42] *See* Section II(B), *infra*.

[43] *See id.*

**CONFIDENTIAL AND PROPRIETARY USPS INFORMATION
SUBJECT TO NGDV PRODUCTION PROGRAM NDA**

The Oshkosh ICE vehicle was rated the highest, with the Oshkosh BEV vehicle only slightly below it technically. ███████████████ ████████████ as its score of ████████████████

█████████████. As the TET concluded: "

████████████████████████████████████████████████████████████████████████████"

The Postal Service then evaluated the offerors' Total Cost of Ownership (TCO) in accordance with the RFP.

| Supplier Name | Total Cost of Ownership | TCO Rank |
|---|---|---|
| Oshkosh (ICE) | ███████ | 1 |
| Workhorse | ███████ | 2 |
| ███████████ | ███████ | █ |
| Oshkosh (BEV) | ███████ | 4 |
| ███████████ | ███████ | █ |

Thereafter, the Postal Service performed a best value tradeoff analysis, with the following results:

| Supplier Name | Technical Score | Technical Ranking | TCO | TCO Ranking | Best Value Ranking |
|---|---|---|---|---|---|
| Oshkosh (ICE) | ████ | 1 | ████ | 1 | 1 |
| Oshkosh (BEV) | ████ | 2 | ████ | 4 | 2 |
| ███████████ | ████ | █ | ████ | █ | █ |
| ███████████ | ████ | █ | ████ | █ | █ |
| Workhorse (BEV) | ████ | 5 | ████ | 2 | 5 |

Due to the fact that the Oshkosh ICE vehicle was ranked 1st in technical score and 1st in evaluated total cost of ownership, ████████████████████████████ The Oshkosh BEV was ranked 2nd in technical score and 4th in price, and thus was ranked 2nd overall in best value. Because Oshkosh could provide both its ICE and BEV under the same contract at whatever mix the Postal Service desired, the Postal Service awarded Oshkosh a single contract to produce ICE and/or BEV vehicles.

The Workhorse technical proposal offering was determined to be ████████████████████████
████████████████████████. Given that technical factors were more important than total cost of ownership, and due to the fact that ████████████████████████████████████
████████████ the Workhorse proposal received a best value rank of fifth out of the five proposals received.

For the foregoing reasons, I deny Workhorse's Disagreement on the basis that the Postal Service did not perform a proper best value tradeoff.

    **C. The Postal Service Correctly Assessed Several ████████████████ to Workhorse's Proposal and Determined That it Was ████████████████.**

While Workhorse's Disagreement ████████ ████████████████
████████████████████████. As disclosed at the March 3, 2021 feedback session, the TET found ████████████████ in Workhorse's proposal that ultimately led it to conclude that the Workhorse proposal was ████████████████. Workhorse received a technical score ████████████████████. What follows is further discussion regarding all of the evaluation factors and sub-factor ████████████ including the several that Workhorse's Disagreement ████████████████████████ Please note that the below list of ████████████ is not intended to represent a complete list of all ████████████ regarding Workhorse's proposal.



**1. Workhorse received** ▮▮▮▮

▮▮▮▮. I will therefore address this critical subfactor first before addressing Workhorse's ▮▮▮. The RFP stated that the TET would evaluate the Safety and Ergonomic subfactor based upon the following:

*The completeness, feasibility, and potential safety value of offeror's various design features, systems, and components that focus on improving safety of operations and minimizing carrier accidents. The degree to which the vehicle conforms to best ergonomic practices. Completeness, availability and value of features that enhance vehicle ergonomics–including features that increase the efficiency of loading, unloading, curbside delivery, package delivery and delivery activities.*

Because of the importance that the Postal Service places upon the safety of its vehicles and health of its carriers, the NGDV TET included 2 safety experts to evaluate proposals. After the initial technical review, the TET found that Workhorse had ▮▮▮▮

▮▮▮

- ▮▮▮; and
- ▮▮▮.

Furthermore, the TET provided additional details as to how the proposal ▮▮▮ and contained several ▮▮▮ make the proposal ▮▮▮. At the outset, the TET notes that the proposal states: "The feasibility of achieving these in production are indicated with either F (Feasible, a modification to the prototype) or HF (Highly Feasible, already designed and tested in the prototype)," but did not clearly indicate the systems that would be included in the final design.[45] Workhorse denotes those systems as follows:

i) ▮▮▮

ii) ▮▮▮

However, elsewhere in its proposal, ▮▮▮[46]

In addition, to review and attempt to address the Postal Service's concerns with the ▮▮▮ raised in our deficiency list of September 3, 2020,[47] Workhorse ▮▮▮

▮▮▮;

[44] ▮.

[45] *See* Workhorse Proposal, Page B-62.

[46] *See id.* at Table B-33 (Tab B-62).

[47] ▮▮▮



While Workhorse ████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████████.

## 2. Design and Technical Approach (Factor 1)

### a. Reliability (Subfactor 1.1)

For the first subfactor under Design and Technical Approach - Reliability - the RFP stated that offerors' proposals would be evaluated on the following:

> *The clarity, completeness and merit of offeror's description of how specific features, materials, assembly techniques, sourcing, and quality control strategies will improve the reliability and durability of the vehicle. Clarity, completeness, and merit of offeror's reliability improvement strategies needed to ensure that the design meets the service life target.*

████████████████████████████████████████

#### i. Workhorse failed to include ████████████████



During the March 3, 2021 debriefing, Workhorse was informed that its ████████████████████ was that its proposal failed to include ████████████████████████

---

[48] *See* Workhorse Proposal, B-65 to B-93.

[49] *See* Disagreement, p.3.

[50] *See id.*

[51] *See* Workhorse Technical Proposal, Tab B-7.

[52] *See id.*

[53] *See id.* at Tab B-8.

[54] *See id.* at Tab B-32; Disagreement, p.6.

**CONFIDENTIAL AND PROPRIETARY USPS INFORMATION**
**SUBJECT TO NGDV PRODUCTION PROGRAM NDA**

ii.   Workhorse ████████████████████████████.

████████████████████████████████████████████.
████████████████████████████████████████████████
████████████████████████████████████████████████
████████  ████████████████████████  ████████████



████████████████████████████████████████████████
█████████████████████████████████████████.█████████
████████████████████. To be clear, the Postal Service never approved these modifications for purposes of the Production program.

████████████████████████  █████████████████████
████████████████████████  █████  ████████████  ██
████████████████████████  █████  ████  ████████
████████████████████████.[56]

For these reasons, I find that the TET properly assigned Workhorse ████████████████ in Subfactor 1.1.

b.   Maintainability (Subfactor 1.2)

---

[55] *See id.* at Tab D-7.

[56] *Id.*

CONFIDENTIAL AND PROPRIETARY USPS INFORMATION
SUBJECT TO NGDV PRODUCTION PROGRAM NDA

For the second subfactor under Design & Technical Approach - Maintainability - the RFP stated that offerors' proposals would be evaluated using the following:

> The completeness and quality of the offeror's description of how specific design features, materials, assembly and/or operating characteristics will lead to reduced maintenance. Practicality of special approaches taken that will result in more efficient servicing and maintenance of the vehicles. Completeness of the description and capability of any on-board self-diagnostic capability built into the vehicle –including provisions for monitoring emissions, safety, and other wear components on the vehicle. Clarity and completeness of any special and routine maintenance procedures, including an overview of maintenance or replacement intervals for major components. Sufficiency of data and analysis to validate claimed service intervals and expected lives of major components.

During the debriefing, the Postal Service identified the following ████████████ in Workhorse's proposal regarding Subfactor 1.2 as follows:

- ████████████████████████████████████████████
- ████████████████████████████████

Workhorse again received ████████████████████████████. Workhorse's Disagreement ████████████████████████ ████████████████; rather, it just concludes ██ ████████████ ████████████.[57]

### i. **Workhorse** ████████████████████████████████████
████████████

Subfactor 1.2 required offerors to provide "data and analysis to validate claimed service intervals and expected lives of major components." Although Tab B-15 of Workhorse's Technical Proposal provided █ ████████████████████████████████████████████████████ ████████████████████.

### ii. **Workhorse's** ████████████████████████████

In addition, Workhorse did not include ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████.

### 3. Supplier Capability (Factor 2)

### a. Engineering Capability (Subfactor 2.1)

For the first subfactor under Supplier Capability – Engineering Capability – the RFP stated that offeror's proposals must demonstrate the following:

---

[57] *See* Workhorse Disagreement, p.7.

**CONFIDENTIAL AND PROPRIETARY USPS INFORMATION**
**SUBJECT TO NGDV PRODUCTION PROGRAM NDA**

*Available resources, qualified personnel, and facilities for production design, development, and warranty support. Capability to develop and adapt emerging technologies for the NGDV design, including a demonstrated path to alternate fuel vehicles, improved fuel efficiency, increased safety, increased delivery efficiency, and autonomous vehicle technologies through vehicle retrofits or in production modifications. Offerors shall include their Emerging Technologies Roadmap, as further described in Special Provision: Emerging Technologies Roadmap in the Terms and Conditions.*

At the debriefing, the evaluation team identified the following ██████████ in Workhorse's proposal with respect to Subfactor 2.1:



- ██ ███████████████████████████
- ██ ███████████████████████████████████
  ███████████████████
- ██ ████████████████████████████

████████████████████████████████████████ Workhorse's Disagreement ████
[58]

**i.  Workhorse** ██████████████████████████████████

█████████████████████████████████[59] While Workhorse stated that its engineering capability included a
█████████████████████████[60]
██████████████████████████████████████████
████████ █████████████████████████████

**ii.  Workhorse** ████████████████████████████████
████████████████████████████

In its proposal, Workhorse included a ██████████████████████████
████████████████[62]
██████████████████████████████████████████████████████
████████████████████[63]

Based upon the foregoing, I find that these ██████████████████████████ for Subfactor 2.1.

**b.  Production & Delivery (Subfactor 2.2)**

For the second subfactor under Supplier Capability – Production and Delivery – the RFP stated that offerors' proposals must demonstrate the following:

*Ability to produce NGDVs in accordance with offeror's proposed production schedule, including a focus on the offeror's production facilities and ability to effectively scale into production. Details of NGDV production strategy, including an outline of existing and*

---

[58] *See* Workhorse Disagreement, p.8.

[59] *See id.*

[60] *See id.*

[61] *See id.* at Tab C-17.

[62] *See id.* at Tab C-14.

[63] *See id.* at Tab C-9.

**CONFIDENTIAL AND PROPRIETARY USPS INFORMATION
SUBJECT TO NGDV PRODUCTION PROGRAM NDA**

*needed resources to mass produce the vehicle. Adaptability of production strategy to incorporate design changes over production lifecycle.  Ability to employ sustainable production through energy efficient operations. Feasibility and detail of offeror's plan to develop and deliver the vehicles according to the proposed schedule, including offeror's financial stability, contingencies, and risk-mitigation concerning the production development and delivery schedule. Evaluation of offerors proposal to first production and planned delivery schedule.*

Workhorse's proposal was assessed the following ███████████ with regards to this subfactor, which were discussed at debriefing:



Workhorse again scored ███████████████████

### i.   **Workhorse** ██████████████████████

While Workhorse's Disagreement ████████████████████████████ Workhorse did not demonstrate that ████████████████ has ever implemented a complete vehicle production program.[64] ██████████████████ but does not perform entire vehicle production activities. ██████████████

### ii.   **Workhorse** ██████████████████████

Workhorse's Disagreement ████████████████████████████ but Workhorse itself made at least ████████████████ from its prototype to its production proposal. Workhorse's proposal, however, ████████████████[65]

████████████████████████████ This lack of essential details was particularly concerning and a ██████, especially when considering ████████████████████ Furthermore, Workhorse's Disagreement ██████████[66]

### iii.   **Workhorse's** ████████████████████

████████████████████████████

---

[64] *See id.* at Exhibit D-9, Tab D-29; Workhorse Disagreement, p.6.

[65] *See* Workhorse Proposal, Tab E.05, p.1.

[66] *See* Workhorse Disagreement, p.8.

**CONFIDENTIAL AND PROPRIETARY USPS INFORMATION**
**SUBJECT TO NGDV PRODUCTION PROGRAM NDA**



Again, Workhorse's Disagreement █████████████████████████████████████ ████
Based upon the foregoing, I find that all ███████████████████████████████ for
Subfactor 2.2.

### c. Service & Parts (Subfactor 2.3)

For the third subfactor under Supplier Capability - Service and Parts – the RFP required offerors'
proposals to demonstrate the following:

> *Present and future capability to provide consistent service support and parts during the*
> *NGDV lifecycle – with clearly defined processes to ensure part availability and support*
> *resources as necessary.*

During the debriefing, the Postal Service identified the following ████████████ ███████████
███████ on Subfactor 2.3 as follows:



### d. Quality (Subfactor 2.4)

For the final subfactor under Production and Delivery - Quality – the RFP required offerors to
demonstrate:

> *Experience with and evidence of the offeror's quality management system and the quality*
> *management system of the offeror's key partners/subcontractor(s). Capability of key*
> *quality management personnel and documentation of qualifications (education and*

**CONFIDENTIAL AND PROPRIETARY USPS INFORMATION**
**SUBJECT TO NGDV PRODUCTION PROGRAM NDA**

*experience). Demonstration of offeror's successful quality management, corrective action, and continuous improvement programs. Demonstrated joint problem solving and process improvements that benefit quality.*

Workhorse's proposal ███████████ ██████ █████████████ with regards to this subfactor:



Workhorse was again scored ████████████████████████ Workhorse ████████████████████

In addition, as discussed previously,

Therefore, the TET properly concluded that Workhorse's quality control program for Subfactor 2.4 was ██████ ████████

### 4. Past Performance (Factor 3)

### a. Prototype Performance (Subfactor 3.1)

For the first subfactor in Past Performance – Prototype Performance – the RFP stated that offerors' proposals much demonstrate:

*Prototype vehicle performance as demonstrated by the Postal Service's testing and observations during the NGDV Prototype Phase, including validation of subsystem reliability, vehicle safety, fuel economy, acceptance testing validation, break-in resistance, cold weather adaptability, and any other relevant performance tests performed by the Postal Service. Ability to maintain consistent operation of the vehicle without durability or safety concerns as demonstrated by the Postal Service's Prototype testing.*

During the debriefing,



---

[67] *See* Workhorse Proposal, Tab D, p.7.

**CONFIDENTIAL AND PROPRIETARY USPS INFORMATION
SUBJECT TO NGDV PRODUCTION PROGRAM NDA**



After the Postal Service determined that testing would end in July 2018, the ████████████████
████████████████████████. In the end, ████████████████████████
████████████████████████ Although Workhorse's
proposal claims ████████████████████████████████ ████████ ████████████
████████████████████████ Therefore, the
TET correctly assessed the Workhorse Prototype performance as a ████████.

**b. Past Performance (Subfactor 3.2)**

For the final subfactor – Past Performance, the RFP stated that it would be evaluated as follows:

> *Extent and quality of offeror and key partners/subcontractor(s) past performance in both research/development and design/production of vehicles. Demonstration of offeror's past performance on prior Postal Service, government and/or commercial contracts of similar type and magnitude and ability to provide high quality and timely delivery of vehicles, including: delivery schedules, quantities, and contact information of contract managers that can verify these production contracts over the last five (5) years.*

During the debriefing, the Postal Service identified the ████████████ of Workhorse's Prior Performance as follows:



---

[68] *See id.* at Tab D, p.10.

[69] *See id.* at Tab D, p.9.

CONFIDENTIAL AND PROPRIETARY USPS INFORMATION
SUBJECT TO NGDV PRODUCTION PROGRAM NDA



■ ████████████████████████████████████

████████████████████████████

  i. ██████████████████████████████
    ███████████████

██████████████████████ While Workhorse
identified a partnership with ███████████,
███████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████ Therefore, the
Postal Service properly concluded that ██████████████ ███████

  ii. ██████████ ██████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████ Therefore, this
██ was properly assessed.

  iii. Workhorse ████████████████████

In addition, Workhorse's proposal ████
████████████████████████████████████
Workhorse's only objection in its Disagreement is that it has ██████████████ █████
██████████████ which does ████████████████████████████

  **D.  The Postal Service performed the TCO evaluation of the offers correctly.**

Contrary to Workhorse's assertions, the Postal Service conducted the Total Cost of Ownership (TCO) evaluation in accordance with the RFP and in a fair and impartial manner. But, to be clear, Workhorse's proposal ██████ ████████████████████ From a TCO perspective, Workhorse's proposed vehicle offering ranked second. ███████████████ █████████████ However, since Workhorse has objected to the TCO methodology in its Disagreement, I will discuss the Postal Service's analysis in further detail below.

  **1.  The TCO calculation was in accordance with the RFP.**

The RFP stated that TCO would be determined "by considering the following factors: Acquisition costs, Maintenance costs, Fuel costs and Charging Infrastructure costs."  As discussed at the March 3rd debriefing, the Postal Service conducted its TCO analysis in accordance with the express terms of the

---

[70] Workhorse Disagreement, p.9.

**CONFIDENTIAL AND PROPRIETARY USPS INFORMATION**
**SUBJECT TO NGDV PRODUCTION PROGRAM NDA**

RFP. Information provided by Workhorse, through submission of its NGDV Production Proposal Workbook Data, was used by USPS to include in its TCO modeling. For uniformity purposes, USPS determined the Charging Infrastructure costs used as part of the TCO calculation for each proposed BEV offering, so Workhorse's evaluated TCO was on equal footing with other electric vehicle offerings with regards to Infrastructure costs. In addition, Acquisition costs included the NRE amount each offeror identified in its proposal, so no offeror would receive an advantage by moving costs between vehicle price and NRE.

### 2. The TCO did not include the costs of retrofitting Oshkosh's ICE NGDVs.

Workhorse asserts ██████████████████████████████████████████████ However, as discussed above and at the feedback session, the cost to retrofit any ICE vehicles was not a component of the TCO analysis. Section II(B) herein details how the Oshkosh proposal includes the option to procure vehicles with ICE or BEV powertrains from the start of production in any quantity or proportions required by the Postal Service. Retrofitting is not a necessity, but rather an added benefit if the circumstances are favorable in the future.

### 3. Workhorse was not asked for its own TCO calculations.

Workhorse complains ███████████████████████████████████████████████ ████████████████████████ ███████████ However, at no point were any offerors asked to provide their own TCO calculations. Information provided by Workhorse, through submission of its NGDV Production Proposal Workbook Data, was used by USPS to include in its TCO modeling.

### 4. Workhorse ████████████████████████████████████████ ██████████████████

Workhorse's proposal submission regarding ████████████████ █ ███████████████████ The Postal Service never intended to evaluate, nor incorporate, ████████████████████████ the Next Generation Delivery Vehicle RFP; rather, ████████████████ were to be solicited through a separate RFP. Therefore, it was appropriate for the Postal Service to exclude ██████████ proposal information from the TCO evaluation.

## E. Workhorse has raised no valid objections to the Oshkosh award.

### 1. Oshkosh's Production Vehicle Was Tested.

Workhorse incorrectly asserts ████████████████████████████████████████████ While no suppliers (including Workhorse) were required to submit a physical vehicle as part of the evaluation process, the proposed Oshkosh Production NGDV design was supported by far more than paper. Oshkosh submitted detailed design drawings and documentation to support the status of the proposed production NGDV vehicle. Oshkosh provided technical documentation, photographs, test data and test reports of the proposed production vehicle. And, as discussed further in Section I(C), this data was generated from physical prototype vehicles built and tested by Oshkosh.

### 2. Offerors were not required to propose the Prototype Vehicle.

Workhorse also complains t██████████████████████████████████████ Of course, this was to be expected. The Postal Service never intended that the vehicle submitted during the Prototype phase would be the final Production vehicle with just a few minor improvements. Rather, offerors had the option – and expectation – to address weaknesses that were identified during Prototype testing and use the information they gained from the Prototype phase to design the Postal Service's optimal delivery vehicle, as Oshkosh did with its ICE and BEV NGDV vehicles.

### 3. Oshkosh's ability to retrofit its ICE vehicles was not part of its technical evaluation or TCO.

Workhorse alleges, ████████████████████████████████████████████ ████████████████████████████████████████████ However, as discussed previously, the Postal Service does not currently have a plan to retrofit ICE vehicles in the future, because it is already developing a plan to obtain a significant quantity of Oshkosh BEV NGDVs as soon as possible. USPS has not determined the final procurement volume of ICE and BEV vehicles, and so, for informational purposes only, inquired about the feasibility of retrofitting ICE vehicles to the BEV powertrain. Oshkosh demonstrated this innovative approach for future consideration; retrofitting of vehicles wasn't a proposal requirement, wasn't evaluated from a TCO perspective, and therefore was not factored into the overall best value decision.

### 4. Workhorse ██████████████████████████████████████

Workhorse also ████████████████████████████████████████████████████████ However, in accordance with the terms of the RFP, the Postal Service did not use these statements of ████████████████ to evaluate the capability of any offeror, including both Oshkosh and Workhorse.

In fact, Workhorse's own public statements ████████████████████████████████████████████ ████████ Most recently, on March 1, 2021, Workhorse stated in its Form 10-K the following:

- "[W]e have in the past experienced a battery pack supply chain constraint as a result of our existing supplier's inability to keep up with volume requirements."

- "Our results of operations have not resulted in profitability and we may not be able to achieve profitability going forward."

- "Our business plan is focused on providing sustainable and cost-effective solutions to the commercial transportation sector but is still unproven. There is no assurance that even if we successfully implement our business plan, we will be able to curtail our losses or ever achieve profitable operations."

- "We have had negative cash flow from operating activities of $70.3 million and $36.9 million for the years ended December 31, 2020 and 2019, respectively…. An inability to generate positive cash flow for the near term may adversely affect our ability to raise needed capital for our business on reasonable terms, diminish supplier or customer willingness to enter into transactions with us, and have other adverse effects that may decrease our long-term viability."

Anyone taking these general statements out of context - ██████████████████████ ████████ ████████████████████████████████████████████████████

### 5. Oshkosh has an intended location to manufacture the NGDVs.

Workhorse also ██████████████████████████████████████████████████████ Again, this is wrong. As required by all offerors, Oshkosh identified a specific facility where it intends to manufacture NGDVs in the United States. The Postal Service evaluated Oshkosh's capabilities on the basis of its well-developed plan at that site, and Oshkosh is ready to proceed with contract performance at that site. However, Oshkosh is also exploring other potential sites for conducting NGDV production, with the intent of obtaining potential cost savings for the Postal Service and further efficiencies for vehicle production.

### III. WORKHORSE'S ██████████████████████ ████████████████████████████

Even if Workhorse had submitted ██████████████████████████ the Postal Service would still have to consider ██████████████████████████████████████ ████████████████████████████████

Due to the public interest in the NGDV program, the Postal Service required that all potential suppliers and their strategic partners and subcontractors execute certain non-disclosure agreements during the program. First, in November 2015, Workhorse executed the "Ground Rules for Supplier Operational Visits & Protection of Postal Service Program Information" (the "Ground Rules"). In Paragraph 4(f) of the Ground Rules, Workhorse agreed that it "shall not discuss the NGDV Prototype program proposal process…with members of the media, or otherwise attempt to improperly influence, either directly or indirectly, the Postal Service's efforts to conduct the NGDV Prototype program in a fair and impartial manner." More recently, on December 4, 2019, Workhorse executed the NGDV Production Program Non-Disclosure Agreement ("NDA"). Pursuant to Paragraph 2 of the NDA, Workhorse agreed "not to make any oral or written statements, either public or private, to any third-parties regarding the NGDV Production Program or [its] participation in the NGDV Production Program…."

Despite these binding obligations, Workhorse ███████████████████████ regarding the NGDV program to third parties. On several occasions, I was required to send notices to VT Hackney or Workhorse concerning ████████████████ including my email of October 13, 2017, my letter of June 20, 2018, my letter of August 16, 2019, and my letter of July 27, 2020. In my letter of August 16, 2019, I warned Workhorse that: "████████████████████████████████████████
██████████ are as follows:

A.   **Workhorse** ██████████████████████████████████████████

████████████████████████████████████████████████████████ had
furnished prototype vehicles to the Postal Service. As just one example, in its 2019 Annual Report, Workhorse stated to investors and the SEC that:

> *Workhorse was one of the five participants that the United States Postal Service ("USPS") selected to build prototype vehicles for the USPS Next Generation Delivery Vehicle ("NGDV") project. … In September 2017, Workhorse delivered six vehicles for prototype testing under the NGDV Acquisition Program in compliance with the terms set forth in their USPS prototype contract.*

█████████████████████████████████████████████████████████
████████████████████████████████

B.   ████████████████████████████ **award while the TET was evaluating its technical proposal.**

Immediately following submission of Production proposals, Workhorse's CFO, Steve Schrader, ████
███████████████████████████████████████████████████
█████████

> *The Post Office, in the March time period, the Spring of 2019, had 6 companies go through prototype and durability testing. We were one of those companies. We are the only all-electric option, and we were 1 of the 3 American companies that went through Prototype testing."[71]*

█████████████████████████████████████████████████████████

█████████████████████████████████ ████████████ ████████████
████████████████████████████████████████████

---

[71] *See* "Workhorse CFO Talks USPS Contract, Says Company Has 2-Year Lead on Competitors," at https://www.benzinga.com/news/20/07/16712149/workhorse-cfo-talks-usps-contract-says-company-has-2-year-lead-on-competitors.

██████████████████████████████████████████████████████
██████████████████████████████████████████████████

██  ███████████████████

### C. Workhorse continues to make public statements ████████████████████████

Following the award to Oshkosh, Workhorse continued to make additional public statements regarding the NGDV Production program.[72]  This was capped off just this last week when, while Workhorse's business Disagreement was pending before the Contracting Officer, a member of Congress contacted the Postal Service ██████████████████████████████████████████████████

██████████████████████████████████████  The Postal Service denied this request.

██████████████████████████████████  ███████  ██████████  with the Postal Service was not evaluated as part of the best value determination, I find that, even if Workhorse had submitted ████████████  the Postal Service would ████████████████████████

██████████████████████

## IV.  REQUEST FOR STAY OF PERFORMANCE

Workhorse's disagreement ████████████████████  ████████████████████  However, a stay of performance is not warranted in this instance. As demonstrated herein, the Postal Service performed a thorough and well-reasoned analysis of all proposals and correctly determined that an award of the NGDV Production Contract to Oshkosh presented the best value to the Postal Service. In any event, the Contracting Officer does not have authority to stay performance of a contract pending a Disagreement. *See* 39 C.F.R. Part 601. For these reasons, Workhorse's requests f████████████████████████████████████  is denied.

## V.  CONCLUSION

For the reasons set forth above, Workhorse's business Disagreement is denied. The Postal Service correctly concluded that Oshkosh's ICE and BEV proposals provide the best value to the Postal Service for its Next Generation Delivery Vehicle Production program.

If you elect to pursue this matter further, you may contest this resolution with the Supplier Disagreement Resolution Official (SDRO) in accordance with 39 C.F.R. § 601.108. As indicated in the regulations, the disagreement must be lodged, in writing, via facsimile, e-mail, hand delivery, or U.S. mail, with the SDRO within ten (10) days of your receipt of this letter. The disagreement must state the factual circumstances relating to it and the remedy sought. The contact information for the SDRO is:

> Supply Management
> Room 1141 (attn: SDR Official)
> United States Postal Service Headquarters
> 475 L'Enfant Plaza SW
> Washington, DC 20260-1141
>
> SDROfficial@usps.gov
> Fax: (202) 268-0075

---

[72] *See* "Workhorse Met with USPS Reps After Missing Out on Delivery Truck Contract, Will Keep Pursuing Options", at https://www.marketwatch.com/story/workhorse-met-with-usps-reps-after-missing-out-on-delivery-truck-contract-will-keep-pursuing-options-2021-03-04.

**CONFIDENTIAL AND PROPRIETARY USPS INFORMATION**
**SUBJECT TO NGDV PRODUCTION PROGRAM NDA**

Sincerely,

E-SIGNED by Delores.B Waters
on 2021-03-22 17:05:48 CDT

Delores B. Waters
Contracting Officer

VEHICLES & DELIVERY/INDUSTRIAL EQUIPMENT
CATEGORY MANAGEMENT CENTER
3190 S. 70TH ST RM 601
PHILADELPHIA, PA 19153-9990
215-863-5047 (W); (215) 776-0122 (C)
FAX:  651-406-5557

**CONFIDENTIAL AND PROPRIETARY USPS INFORMATION
SUBJECT TO NGDV PRODUCTION PROGRAM NDA**